**UNITED STATES of America**

v.

**CERTAIN LAND IN BALTIMORE COUNTY, STATE OF MARYLAND, and Garden Construction Corporation, et al.**

**Civ. No. 10133.**

United States District Court
D. Maryland.

Sept. 26, 1962.

William F. Smith, Atty., Dept. of Justice, Washington, D. C., Joseph D. Tydings, U. S. Atty., and Arthur G. Murphy, Asst. U. S. Atty., Baltimore, Md., for plaintiff.

Wilson K. Barnes, Baltimore, Md., for defendants.

THOMSEN, Chief Judge.

The principal disputes in this condemnation case, which was heard by the court without a jury, are: what is the highest and best use of the land taken by the government on November 7, 1957; and whether the owner, Garden Construction Corporation (Garden), is entitled to severance damages because it will be unable to divert, across the land which was taken, a stream which flows through the remaining land. The two tracts condemned in this case are: Tract I, Parcel 1, 16.638 acres; Tract II, Parcel 2, 12.860 acres; and Parcel 3, 1.690 acres; a total of 14.550 acres in Tract II; a grand total of 31.188 acres, as shown on the plat attached to this opinion.

## Historical Facts

In 1952–53 Garden assembled a 475 acre tract known as The Meadows by acquiring options, which were exercised over several years. The tract lies in the Woodlawn area of Baltimore County, west and southwest of Lorraine Cemetery, running out to the Baltimore County Beltway on both sides of Security Boulevard. Neither the Beltway nor the Boulevard existed in 1952 or in 1957, although the route of the Beltway had been pretty well determined; it was opened to traffic in the summer of 1962. Garden's original plan was to develop The Meadows as a residential area, with a number of schools and churches and a large shopping center. About fifty houses have been built and sold in the northeast portion of the tract.

In 1954 the government, through the GSA, was seeking a site for a new Social Security (OASI) building, where some 10,000 people would be employed. Garden offered to sell to the government fifty acres for $130,000 and to guarantee the construction of a dual highway, Security Boulevard, to connect the building with existing roads south and east of the property. The offer was accepted and the government acquired the original 50 acre tract in 1955. Garden was willing to sell the land at a low price and to pay the government's normal share of the road construction costs because of the benefit to the rest of Garden's property from having the OASI building there.

Later in 1954 Garden prepared a plan showing the proposed development of The Meadows, and the proposed development of another area east and south of the OASI site (including Tract I in this case), as Colonial Parks Estates.

In 1955 Garden attempted to have the zoning of the property along Security Boulevard changed from R.6. (Residential) to commercial. After hearings and appeals, a settlement was reached under which certain properties on the north side of Security Boulevard, near the houses which had already been built, and the property (Tract II in this case) on the south side of Security Boulevard immediately west of the OASI site, remained residential; the rest of the property north and south of Security Boulevard, from the OASI site to the Beltway site, received commercial or industrial classifications.

In 1956 the Board of Education bought 47 acres on the west side of Clark's Lane, north of Security Boulevard, for a high school. In 1957 the school site was shifted to the east side of Clark's Lane, some 350 feet north of Security Boulevard, and the old school site was reserved for the proposed shopping center.

Also in 1956 Garden learned that a proposed new interstate highway, I–70–N, to be built at some indefinite time in the future, will run just south of The Meadows, probably along the south line of Tract I. The sale of houses in The Meadows had not been going well, and the proposed non-access highway would not help the residential development, so Garden began to revise its planning, increasing the emphasis on commercial development.

Late in 1956 the government decided that it needed an additional 30 acres adjoining the OASI site, principally for parking, since the size of the planned building was being increased. Garden thereupon offered to sell the government what is now Tract I, Parcel 1, together with Parcel 2 but not Parcel 3 in Tract II, with enough land out of the proposed bed of Clark's Lane to make up the desired acreage, part at $5,500 an acre and part at $4,500 an acre. Parcel 3 was omitted from the offer because Garden wished to change the course of Little Dead Run, causing it to run across Parcel 3.

Dead Run flows from west to east through the northern part of The Meadows, south of Dogwood Road. Little Dead Run flows, when it does flow, from southwest to northeast, meeting Dead Run in the northeast portion of The Meadows. At all material times Little Dead Run crossed the lines of the proposed Security Boulevard at its inter-

section with the proposed Clark's Lane; it now flows under that intersection through a culvert. It was evident that Little Dead Run would be a problem on the northeast corner of the intersection, where it flows diagonally across the corner lot, which fronts about 800 feet on Security Boulevard with a depth of about 350 feet, south of the high school site. To prevent this interference with the development of the north side of Security Boulevard, Garden contemplated changing the course of Little Dead Run so that it would flow south of Security Boulevard across the line of Clark's Lane and Parcel 3, and then turn north under Security Boulevard through a culvert at the east end of Parcel 3, leaving Tract II a frontage of only 52 feet on Security Boulevard. This proposed use of Parcel 3 was the reason Garden did not include that parcel in its December 1956 offer to the government, nor in the two later offers which it made in September 1957.

The government did not accept the 1956 offer and Garden proceeded with its second effort to secure a change in the zoning along Security Boulevard. On a plat presented with its application to the Zoning Commission in August 1957, Garden requested that Tract I be zoned M.L. (Manufacturing Light), Tract II, M.R. (Manufacturing Restricted), and the land on the north side of Security Boulevard east of Clark's Lane, M.L. This plat was withdrawn and the Zoning Commission did not issue the customary notices until after an amended petition and plat were filed in December 1957.

Meanwhile, on September 11, Garden had made to the government a slightly different offer of about 30 acres, including Parcels 1 and 2, at $5,000 an acre. That offer was withdrawn on September 27 and replaced by a 30-day offer of substantially the same properties for $193,-700, about $6,500 an acre. The latter offer was not accepted, and it expired. On November 2 the government let the contract for the construction of the OASI building for $22,060,544. On November 7 the government filed this proceeding, taking Parcel 3 (1.690 acres) as well as

Parcel 2 (12.860 acres) and Parcel 1 (16.638 acres). The government deposited $139,302 as alleged just compensation. Efforts to work out a settlement under which Little Dead Run might still be shifted to flow across Parcel 3 were unavailing, and the County forced Garden to enter into an arrangement whereby Little Dead Run has been carried under the intersection of Security Boulevard and Clark's Lane and the course of the stream has been deeded to the County. Construction of Security Boulevard as far as Clark's Lane was begun in 1960; it was later extended to connect with the Beltway.

The amended zoning application and plat, filed in December 1957, did not ask for the rezoning of any of the land which had been taken by the government in November. The requested changes to M.L. on the north side of Security Boulevard were granted by the Zoning Commissioner, and on appeal were settled by Garden placing reasonable restrictions on the use of the property fronting on the north side of Security Boulevard east to Gwynn Oak Avenue and for a short distance west thereof.

In 1960 Garden sold 1.38 acres on the northwest corner of Gwynn Oak Avenue and Security Boulevard to Maryland Trust Company for $115,000, and a 4 acre lot on the north side of Security Boulevard to Colt Lanes (for a bowling alley) at $31,315 per acre. Both of these lots are directly opposite the OASI building. Also in 1960 it sold 3.24 acres along the Beltway to Whitehead Metals at $15,000 per acre. A number of other commercial sales have been made. Work on the shopping center on the northwest corner of Security Boulevard and Clark's Lane began in the summer of 1962.

*Opinion Evidence*

The government offered the evidence of two expert real estate appraisers, who testified that in their opinion the highest and the best use for both Tract I and Tract II was for detached or semi-detached housing, permitted by the R.6. zoning in November 1957. One of its witnesses,

Cox, valued Tract I at $4,000 per acre, Tract II at $5,000 per acre. The other, McCurdy, valued Tract I at $4,250 per acre, Tract II at $5,000 per acre. Both considered many sales, some of which they felt were comparable, some not. McCurdy considered the 1960 sales in The Meadows, referred to above.

Garden produced two experienced planners, Rogers and Willemain, who testified that in their opinion the R.6. classification of the two tracts was unreasonable and that it should have been assumed on November 7, 1957, that the two tracts would be rezoned M.L. in the near future.

The Vice-president of Garden, McFadden, valued both tracts at $15,000 per acre. Garden's two expert appraisers, Klein and Riepe, testified that the highest and best use for each tract was for commercial purposes permitted under an M.L. classification. Klein valued Tract I at $9,000 per acre, Tract II at $15,000 per acre; Riepe, Tract I at $8,500 per acre, Tract II at $12,000 per acre. Both considered sales all around the city, many of them to developers of shopping centers.

Both Klein and Riepe felt that the value of the lot on the northeast corner of Security Boulevard and Clark's Lane would have been greater if Little Dead Run were diverted over Parcel 3 of Tract II. Klein estimated the difference in value at $82,000, Riepe at $61,637. Garden claims the difference in value as severance damages. Neither Klein nor Riepe considered what the effect on the value of Tract II would have been if most of its frontage on Security Boulevard had been eliminated by removing Parcel 3 from Tract II and diverting Little Dead Run across Parcel 3. The government appraisers testified that in their opinion there had been no severance damage to the remaining land.

### Law

■ Many of the legal principles governing this case are so well known that they need not be restated. See United States v. Miller, 317 U.S. 369, 63 S.Ct. 276, 87 L.Ed. 336 (1943); McCandless v. United States, 298 U.S. 342, 56 S.Ct. 764, 80 L.Ed. 1205 (1936); United States v. Carroll, 4 Cir., 304 F.2d 300 (1962), and cases cited therein at p. 306; Nichols on Eminent Domain (1962), Vol. 4, sec. 12.314, p. 140. It may be noted, however, that in determining the most profitable use to which the land can reasonably be put in the reasonably near future, the existing zoning restrictions should be considered, together with the probability of any change therein. The burden of proof of the reasonable probability of a change is on the landowner. Rapid Transit Co. v. United States, 10 Cir., 295 F.2d 465 (1961), cert. den. 369 U.S. 819, 82 S.Ct. 831, 7 L.Ed. 2d 785; Westchester County Park Commission v. United States, 2 Cir., 143 F.2d 688, 693 (1944); United States v. Delano Park Homes, 2 Cir., 146 F.2d 473, 474 (1944); United States v. 50.8 Acres of Land, Etc., E.D.N.Y., 149 F.Supp. 749, 752 (1957); State Roads Commission v. Warriner, 211 Md. 480, 128 A.2d 248 (1957). See also McCandless v. United States, supra; Nichols, op. cit., sec. 12.-322(1), p. 238.

### Ultimate Facts

■ I am satisfied that there was a reasonable probability as of November 7, 1957, that the zoning on Tracts I and II would have been changed from R.6. (Residential) to either M.L. (Manufacturing Light) or M.R. (Manufacturing Restricted) if a request had been made therefor. Principally because the government would have been interested in seeing that some of the uses permitted by M.L. were not indulged in on premises adjacent to the OASI building, I find that such change in the zoning classification of the two tracts would probably have been to M.R. or to M.L., with certain restrictions of record such as Garden gave for the properties on the north side of Security Boulevard on both sides of Gwynn Oak Avenue.

However, as noted by Cox and McCurdy, zoning does not create value; it permits the realization of potential value.

In view of the large amount of available M.L. and other commercially usable land in The Meadows and generally along the Beltway, I find that it would probably have been a long time before a commercial purchaser at a price above $5,000 an acre would have been found for Tract I, which was the least accessible land for commercial purposes at that time in The Meadows. I further find that McCurdy's valuation of $4,250 an acre was the fair value of Tract I for residential purposes. I conclude that $5,000 an acre was just compensation for the taking of Tract I.

Tract II is a different matter. Including Parcel 3, it offered what was potentially the most accessible commercial corner with respect to the OASI building. A small lot on this corner would have been attractive to a bank or savings association, and other lots of varying sizes should have been easily salable, even though Garden was also interested in developing its planned shopping center on the northeast corner. I find that the highest and best use of Tract II was commercial, for uses permitted by the probable zoning and restrictions. I concur with the experts in concluding that an apartment development was not the highest and best use. Of all the appraisers I give much the greatest weight to the testimony of Riepe that Tract II had a value of $174,600 (which is at the rate of $12,000 an acre) in November 1957. In finding such value, I am considering as an important factor the extended frontage on Security Boulevard furnished by the inclusion of Parcel 3 in Tract II. Without Parcel 3, Tract II would have been worth much less.

### The Claim for Severance Damage

Garden claims severance damage for the difference in the value of the land on the northeast corner of Security Boulevard and Clark's Lane as it was at the time of the taking and as it might have been if Garden had been able to divert Little Dead Run across the land on the southeast corner (Tract II, Parcel 3 of the taking) rather than across the northeast corner where it now flows and has flowed at all material times.

There are at least two reasons why this claim cannot be allowed. *First*, because the claim is for a frustration of business opportunity, within the meaning of the cases, and is therefore not allowable as severance damages. United States ex rel. T. V. A. v. Powelson, 319 U.S. 266, 63 S.Ct. 1047, 87 L.Ed. 1390 (1943); West Virginia Pulp & Paper Co. v. United States, 4 Cir., 200 F.2d 100 (1952); Baetjer v. United States, 1 Cir., 143 F.2d 391 (1944). Cf. United States v. Grizzard, 219 U.S. 180, 31 S.Ct. 162, 55 L.Ed. 165 (1911); United States v. Chicago B & O RR Co., 8 Cir., 82 F.2d 131 (1936). The taking did not change the existing condition of the land; it simply prevented one of the alternative methods of developing the property.

*Second*, because any increase in the value of the land on the northeast corner which might have been achieved by diverting Little Dead Run would have been matched by an equivalent reduction in value of the land on the southeast corner (Tract II of the taking) by the elimination of Parcel 3 therefrom. This would be true even though the size of Tract II might have been restored by adding to Parcel 2 some land out of the then proposed bed of Clark's Lane. The elimination of Parcel 3 from the taking would have eliminated the valuable corner and all but 52 feet of the frontage of Tract II on Security Boulevard. The resulting reduction in value of the land taken (i. e. Tract II) would have approximately equalled the increase in value of the land which remained.[1] The landowner cannot have it both ways.

---

1. I accept the opinion of Riepe that the northeast corner would have been worth $61,637 more if the stream had been diverted. I find that even if Tract II were restored to its original size by adding to Parcel 2 some land out of the bed of Clark's Lane, the value of Tract II would have been reduced to $8,000 an acre, a reduction in value of $58,200. None of the appraisers expressed any opinion as to the value of Tract II without Parcel 3.

**56**

*Other Claimed Damage*

Garden also claims $9,285 for the pipes necessary to carry under Security Boulevard drainage water from the original 50 acre site purchased by the government in 1956. The government did change the flow of drainage off the 50 acre site to some extent and carried some of the water through a pipe emptying into the bed of Security Boulevard, as then proposed and now built. The pipe, however, did not go under any part of the land taken in this case. Garden may have had a claim against the government under the Tort Claims Act; on the other hand, this may have been an item which was covered or which should have been covered by the original contract of sale. However that may be, Garden can maintain no claim for such damage in this proceeding.

Nor does Garden have any claim herein for engineering services and expenses in the amount of $3,395.08, "incurred in the development of The Meadows due to the relocation of drainage structures brought about by the condemnation of a portion of the property".

*Admissibility of Garden's
Offers to Sell*

 Garden objected to the admission in evidence of its offers to sell Parcels 1 and 2 to the government at various prices during 1956 and 1957. The evidence was admissible. Hanson Lumber Co. v. United States, 261 U.S. 581, 588, 589, 42 S.Ct. 442, 67 L.Ed. 809 (1923); Erceg v. Fairbanks Exploration Co., 9 Cir., 95 F.2d 850, 854 (1938). However, since the offers did not include Parcel 3, they have little weight in determining the value of Tract II as taken. The offers confirm the opinion of the court with respect to the value of Tract I and of Tract II if Parcel 3 were eliminated therefrom, but the court would have reached the same conclusion as to value apart from the offers.

*Interest*

At $5,000 an acre, the allowance for Tract I amounts to $83,190; at $12,000 an acre, the allowance for Tract II, $174,-600. The sum of the two is $257,790. The government deposited $139,302. Garden is therefore entitled to interest at the rate of 6% per annum on the difference, $118,488, from November 7, 1957 to the date of payment. 40 U.S.C.A. § 258a.

Judgment will be entered accordingly.