## THE HOLY TRINITY RUSSIAN INDEPENDENT ORTHODOX CHURCH *v.* STATE ROADS COMMISSION OF MARYLAND

[No. 133, September Term 1967.]

*Decided April 3, 1968.*

The cause was argued before HORNEY, MARBURY, BARNES, McWILLIAMS and SINGLEY, JJ.

*James Kardash* and *Philander B. Briscoe* for appellant.

*Herbert L. Cohen, Special Attorney,* and *J. Thomas Nissel, Special Attorney,* with whom were *Francis B. Burch, Attorney General,* and *Joseph D. Buscher, Special Assistant Attorney General,* on the brief, for appellee.

McWILLIAMS, J., delivered the opinion of the Court.

To provide a portion of the right of way required for Interstate Route 95 (the expressway) appellee (the commission) was obliged to acquire 7.53 acres of appellant's land in Howard County. Dissatisfied with the award ($17,500) of the condemnation jury, appellant (the church) wants us to reverse the judgment and remand the case to be tried again so that, perchance, a higher figure may be forthcoming. We have found in the record nothing which would justify our doing so.

The church is located on Fairmount Avenue in East Baltimore. The neighborhood, according to Father Champion, the pastor, is "very depressed" and the buildings (church and rectory) are now "in the state of falling apart." Only 3 or 4 of the 187 families constituting the congregation live in the neighborhood. The rest are scattered throughout the city. After the church's cemetery had been taken by the city for the construction of Friendship International Airport the church, in 1947, bought a 71.6 acre tract on the north side of Lawyer's Hill Road near Elkridge in Howard County. The road frontage was interrupted by a 7 acre tract, about 600 feet deep, which had been sold off prior to 1947. The frontage to the west of the 7 acre tract was about 330 feet; to the east it was 545 feet. The remains of about 300 persons were removed from Friendship and reinterred in the 10 acres (of the 71.6 acres) that had been set aside as a graveyard. At the time of trial there were 2181 lots in the graveyard, 600 of which were occupied (including the 300 from Friendship). There was testimony that there were about 40 lots outside of the 10 acres.

A chapel and recreational facilities were built and the eventual transfer of all church activities to the property has been under consideration. Funeral services are held in the chapel and in the warmer weather regular Sunday services are held either in the chapel or outside in "the cathedral garden." Roadways, driveways and a children's playground were installed. There has been talk of a swimming pool and a rectory.

The first comprehensive zoning ordinance in Howard County was enacted in 1948. The church property subsequently was zoned R-20 (residential, 20,000 sq. ft. minimum). The regulations do not allow cemeteries in R-20 districts without a special permit. Section 19.04 reads as follows:

"'The Board (of Zoning Appeals) may permit additions to existing cemeteries in any District and new cemeteries in the R-90 to R-20 Districts, provided adequate provisions, satisfactory to the Board and legally binding upon the operation of any cemetery, requiring perpetual care of such cemeteries, shall be filed with the Board before such use is approved. Entrances and exits to and from Cemeteries shall be clearly marked and the location of such exits and entrances shall be approved by the Board only after a thorough study of traffic conditions in the neighborhood."

The church's non-conforming use is governed by Section 20 of the regulations which, in part, are as follows:

"20.01 Any use which now legally exists and does not comply with the regulations of the district in which it is situated shall be known as a non-conforming use. *Such use shall be confined to* that part of a building or *the extent of land actually used at the time of the passage of these regulations,* except as hereinafter provided.

"20.02 If a non-conforming use is changed to a use of a higher classification it may not thereafter be changed to a use of a lower classification.

"20.03 A non-conforming use may not be changed to a use of the same classification unless approved by the Board of Zoning Appeals, as provided in Section 30 and subject to the limitations, guides and standards as provided in Section 31.

"20.04 *A non-conforming use may not be extended, increased in size* or changed in design and buildings may not be erected or extended on land used as a non-conforming use *unless approved by the Board of Zoning Appeals,* as provided in Section 30 and subject to the limitations, guides and standards as provided in Section 31."

\* \* \*

"20.06 Whether a non-conforming use exists or whether a non-conforming use has been abandoned shall

be a question of fact and shall be determined by the Board of Zoning Appeals after a public notice and hearing in accordance with rules of the Board." (Emphases supplied.)

The expressway will be generally parallel to and about ½ mile northwest of the Washington Boulevard (U.S. Route 1). It will also be generally parallel to and about 200 to 225 feet to the northwest of Lawyer's Hill Road. The land taken from the church was described as "low land with a stream running" through 3 "swales and natural water courses." John A. Jean, the commission's real estate expert, testified he "couldn't conceive anybody burying anyone there."

After the taking and the construction of the expressway the church will have 2 lots, 2.11 acres and 1.71 acres respectively, with the same frontage as before on Lawyer's Hill Road, both running back 200 feet, more or less, to the southeast edge of the expressway to which, of course, there will be no access from either of the 2 lots. Access to Lawyer's Hill Road from the church's remaining 60.32 acres will be no longer possible, and access to the expressway itself will be denied, but the commission will provide a service road running along the northwest side of the expressway to Montgomery Road, a distance of 1000 feet. The church property will have over 1300 feet of frontage on the service road and access thereto at any point, subject only to the commission's regulations.

At the trial before Mayfield, J., and a jury on 28 and 29 November 1966 the commission produced Mr. Jean whose qualifications were not challenged by the church. In his opinion, he said, the highest and best use of the two parcels (6.04 acres and 3.54 acres) fronting on Lawyer's Hill Road "would be residential home sites, small estate" and that the remaining 60.32 acres to the north of the taking "would be cemetery with recreational uses." Since the value of the remaining 60.32 acres would not, in his opinion, be diminished by the taking, his testimony was confined to the damages arising out of the taking of parts of the two lots fronting on the road to which he assigned a value of $1800 per acre. After allowing for the destruction of a stone gate, some paving and other minor items he "rounded out" his appraisal to $13,300.

Mr. Jean, in support of his $1800 figure, cited sales of neighboring properties he considered comparable. The church objected to this testimony because the properties were not devoted to cemetery use. The objection was overruled. The church produced Peter Lisowsky who said he was president of its governing body. He was not permitted to say what were the "future plans" of the church for "further improvement to the cemetery." When asked what was the sale price of the lots he replied that a single "burial plot sells for $156." After he had answered the question the commission objected and the trial judge indicated he would refuse to allow any further testimony on the sale price of the lots but there was no motion to strike the testimony from the record or to instruct the jury to disregard it. He testified, without objection, that the entire property was worth $400,000 and that the value of the land taken by the commission was $59,650. The court did not permit him to testify in respect of lot values but the record shows that he said a lot large enough for 6 graves sold for $306. The commission, as before, objected after the statement was made but there was no motion to strike or to instruct the jury to disregard it. The church produced as its expert real estate witness William S. Hanna, whose qualifications were not challenged. He said the land was "used primarily as a church property, with a graveyard, with the chapel, [and] recreational facilities for * * * [the] congregation." Mr. Hanna valued the part taken by the commission at $1500 per acre, citing in support thereof "land in this area [which] has sold for $1500 [to $2000] an acre." He made no attempt to classify the land taken as being a part of a cemetery or suitable for cemetery purposes. The $1500 figure was derived from the sale of residential properties. In his opinion total compensable damages amounted to $43,-260, $32,070 of which was arrived at by assigning a consequential damage of $500 per acre to the remaining land. The latter figure seems to have been plucked out of the air for we have been unable to discover any basis for it.

Neither the commission nor the church submitted a request for instructions and the court's charge was unremarkable. He told the jury the church was "entitled to the use and enjoyment of the * * * [land] for the *highest* and *best* use for which

it is adapted" and that "in assessing the consequential damages to the remainder" they might take into account "all inconveniences" to the remainder. (Emphasis supplied.) He recapitulated the damage testimony and told them the determination of the amount to be awarded was their exclusive prerogative. Neither side excepted to the charge.

The church contends the trial judge erred in a number of instances but through all of them runs a common thread; viz., that it was free to subdivide all of its land into cemetery lots and that all of it was available for such a use. In our judgment this is clearly not the case. Section 19.04 of the zoning regulations authorizes, under certain conditions, the issuance of a special permit for additions to existing cemeteries in any district and new cemeteries in R-20 districts. The church, of course, has a non-conforming use but it should be noted that the use must be confined to "the extent * * * actually used at the time of the passage" of the regulations unless approval is given by the Board of Zoning Appeals. We think, however, that the church had the burden, which it has not met, of showing how much of the 71.6 acres was devoted to the non-conforming use when the regulations were adopted. Other than the 10 acres and the 40 lots mentioned earlier, there is nothing in the record suggesting that any other area was part of the existing cemetery.

A number of factors seem to make it unlikely that the Board of Zoning Appeals would be inclined to allow any of the land taken by the commission to be used for burial purposes. There is, for instance, the testimony that the topography does not lend itself to such a use. Moreover, should it ever become necessary to extend or enlarge the non-conforming use, it seems reasonable to expect that the extension or enlargement would be confined to the site of the existing non-conforming use, which is about 1000 feet north of the land taken for the expressway and the record indicates that the need for an extension is not likely to arise at any time in the foreseeable future. Only 600 (including 300 from Friendship) of the 2181 lots sold since 1947 have been used for burial purposes and, although the testimony is not altogether clear on this point, one gets the impression that about half of the 10 acres is still available for grave site development. There is also the clear indication that the church never

did and does not now intend the entire tract to become a cemetery, in which case the use of the rugged area of the taking would more likely be used for recreational purposes than the cleared level area in the vicinity of the chapel. Moreover, the record lacks any evidence tending to prove that the church ever intended the land taken by the commission to be used for cemetery purposes. Indeed, as will be seen, there is testimony that other uses (a new church, a parish hall and a rectory) were contemplated.

In any event the church has not shown nor has it made any attempt to show that there exists any reasonable probability that a petition to extend the non-conforming use would be granted by the Board of Zoning Appeals within a reasonable time after the taking, or to show that the original zoning was erroneous. The burden of making such a showing rests with the church. *State Roads Commission v. Warriner,* 211 Md. 480, 128 A. 2d 248 (1957) ; *United States v. Certain Land in Baltimore County, Md.,* 209 F. Supp. 50 (1962). In these circumstances it matters little that the trial judge overruled the church's objection to the use of sales of property not devoted to cemetery use, or that during the cross-examination of Mr. Jean, he sustained the commission's objection to a question calculated to elicit an admission that more money would be realized from the condemned land if it were divided into cemetery lots, or that he excluded testimony relating to the value of the church's cemetery lots and cemetery lots elsewhere, or that he would not permit Mr. Lisowsky, in explaining his appraisal, to discuss the value of cemetery lots. That the trial judge's errors were harmless, if they exist at all, is emphasized by the fact that the record actually contains most of the evidence the church contends was excluded. As we have said, there is testimony that the sale price of single lots is $156 and that one large enough for 6 graves goes for $306. Mr. Lisowsky's damage figure, $59,650, obviously was based on the price of cemetery lots and, equally obviously, it would not have been greater even if he had been allowed to explain it. And if, as seems evident, he was about to assume that the extension of the non-conforming use to the entire property *had already taken place,* his testimony should

have been excluded. In *Hutchison v. Baltimore Gas & Electric,* 241 Md. 329, 332, 216 A. 2d 573 (1966), we said:

> "We think the trial judge was correct in excluding the testimony of the witness Helfrich. As pointed out by the appellant, it is permissible for an appraiser, when valuing property in a condemnation case, to consider the probability of a tract being rezoned to a higher or lower classification in the reasonably near future. *Bergeman v. State Roads Comm.,* 218 Md. 137, 146 A. 2d 48; *Lustine v. State Roads Comm.,* 217 Md. 274, 142 A. 2d 566; *State Roads Comm. v. Warriner,* 211 Md. 480, 128 A. 2d 248. *However, it is manifestly improper to allow a real estate appraiser in such a case to value property as if it were in fact already zoned to the higher classification.* The reason for this was suggested in Mr. Helfrich's own testimony, i.e., change in zoning is a risky and uncertain matter and a purchaser in the open market would certainly not pay the same amount for land which has the possibility of being rezoned to a higher (more valuable) classification tha[t] he would be willing to pay if the change in zoning had already been accomplished." (Emphasis supplied.)

During his cross-examination Mr. Jean was asked if he knew that "the church [had] planned to build its new church building and parish hall fronting on Lawyer's Hill Road." The court sustained the commission's objection to the question and the church contends this was error. We think the question was improper because the church did not lay a proper foundation for the question, nor did it, at the time, proffer evidence tending to prove that any such plans had ever been considered or formulated. The same contention was made in respect of the court's refusal to allow Mr. Lisowsky to answer the question, "What plans, if any, did you have for further improvements for the cemetery property." In light of what we have said concerning the absence of any showing of the reasonable probability of the extension of the non-conforming use, we think this question also was improper. Oddly enough, both contentions lose much

of their force and substance when the testimony of Father Champion is considered. He testified, later in the trial, without objection, that the church "had hoped to build a church and a beautiful rectory on Lawyer's Hill Road." There was no motion to strike his testimony or to instruct the jury to disregard it.

It seems to us the case was fairly tried and that the church did succeed in getting to the jury most, if not quite all, of the evidence it produced. That it chose not to offer more, or more detailed, evidence may have been, to some extent, the reason why the verdict of the jury fell short of its expectations. As we said at the outset, we have not been shown enough to justify upsetting the judgment of the trial court.

*Judgment affirmed.*
*Appellant to pay the costs.*