30 A.3d 992

**Richard TEMPEL, et al.**

v.

**Elena L. MURPHY, et al.**

**No. 1199, Sept. Term, 2010.**

Court of Special Appeals of Maryland.

Oct. 28, 2011.

Christopher Norman (Ronald W. Shaw, Amanda P. Just, Shaw, Joseph & Just, PA, on the brief), Hunt Valley, MD, for appellant.

Julia R. Arfaa (Emily C. Malarkey, Salsbury, Clements, Bekman, Marder & Adkins, LLC, on the brief), Baltimore, MD, for appellee.

Panel: EYLER, JAMES R., WATTS, and J. FREDERICK SHARER (Retired, specially assigned), JJ.

EYLER, JAMES R., J.

This appeal arises out of a medical negligence lawsuit, instituted in the Circuit Court for Baltimore County, involving the death of 59-year old Thomas Murphy at St. Joseph Medical Center ("St. Joseph's"). Survival and wrongful death claims were subsequently brought by Elena Murphy, individually and as the personal representative of the Estate of Thomas Murphy, and Caroline and Meghan Murphy (collectively "appellees"), against Melissa Fox, M.D.; her employer, Patient First of Maryland ("Patient First"); David Utzschneider, M.D.; his employer, St. Joseph's; Richard Tempel, M.D.; and his employer, Osler Drive Emergency Physician Association.

Prior to the jury trial, appellees settled with Dr. Fox, Dr. Utzschneider, and their employers at a private mediation. Dr. Tempel and his employer, appellants, did not settle with appellees. After learning of the settlements, appellants moved to compel the production of the settlement documents. The motions were denied.

On March 29, 2010, at the conclusion of an eleven-day trial, the jury awarded appellees damages totaling $1,440,000: $5,000 in funeral expenses; $235,000 in loss of household services; $600,000 for the loss of Mr. Murphy's salary; $300,000 in noneconomic damages to Mrs. Murphy; $100,000 in non-economic damages to Meghan Murphy; $100,000 in non-economic damages to Caroline Murphy; and, $100,000 in damages to Mr. Murphy's estate for pain and suffering.

Subsequently, on April 12, 2010, appellants moved for judgment notwithstanding the verdict on the issue of Mr. Murphy's lost salary, arguing that the $600,000 award was speculative and that appellees had failed to satisfy their burden of produc-

tion in that regard. The court denied the motion. This appeal followed.

On appeal, appellants raise the following questions for our review:

1. Whether the trial court erred by refusing to allow appellants to inspect the amounts of the two settlement agreements prior to judgment?

2. Whether the trial court erred by denying appellants' motion for judgment notwithstanding the verdict as to the speculative nature of the appellees' evidence of loss of financial support?

Perceiving no error, we shall affirm.

### Factual Background

The underlying background facts giving rise to the cause of action are not in dispute, nor are they necessary to our disposition. Appellees essentially accept appellants' recitation of the background facts, thus, we shall quote the facts as presented by appellants, omitting footnotes and citations to the record. We shall supplement and modify the facts where necessary.

On Thursday, June 9, 2007, Mr. Murphy and his wife (a nurse) came to Patient First and saw Dr. Melissa Fox. Mr. Murphy complained of fever, chills, aches, pains, and generalized malaise of two days in duration. Following a physical exam and laboratory testing, Dr. Fox's impression was that Mr. Fox had the flu, and possibly Lyme disease. She took a Lyme titer, gave him 2 liters of fluids, prescribed him doxycycline, and instructed him to return to Patient First as needed.

Mr. Murphy and his wife presented to [St. Joseph's] at approximately 5:30 p.m. on June 10, 2007. Mr. Murphy was triaged at 5:36 p.m., placed in a room by 5:55 p.m., and between 6:15 p.m. and 6:30 p.m., he was seen by Dr. Tempel. His chief complaint at that time was trouble breathing. His EKG and heart enzymes were normal, which indicated that his troubles were probably not cardiac

in origin. Dr. Tempel ordered a CT scan of Mr. Murphy's chest, 1 liter of fluid, and laboratory work.

The labs came back at 7:10 p.m. and were suggestive of an infection. At 7:20 p.m., Dr. Tempel ordered Levaquin, a broad-spectrum antibiotic. Mr. Murphy was in the CT scan until 7:45 p.m., so he received the Levaquin at approximately 8:00 p.m. Dr. Tempel reviewed Mr. Murphy's CT scan and believed that he saw a suspicious area in Mr. Murphy's lung. Given Mr. Murphy's trouble breathing, the results of the CT scan, and the lab results, Dr. Tempel believed Mr. Murphy was suffering from pneumonia and dehydration. At 8:40 p.m., Dr. Tempel ordered that Mr. Murphy be admitted to [St. Joseph's]. Dr. Tempel, as the ER physician, could not actually admit Mr. Murphy to the hospital, so he paged Dr. Utzschneider, the admitting physician on call, at 8:53 p.m.

Dr. Utzschneider phoned in his admitting orders from home at 9:10 p.m. He never came in to see Mr. Murphy. Instead, he asked the hospitalist to perform the admitting history and physical. He also reduced the amount of fluids that Dr. Tempel had ordered for Mr. Murphy. For some reason that the parties were never able to determine, Mr. Murphy was not actually transferred from the ER to the floor until approximately midnight. The hospitalist saw Mr. Murphy about ten minutes later.

By 3:00 a.m., Mr. Murphy's condition had deteriorated. His blood pressure began to fall and he developed abdominal distension. At 10:00 a.m. and again at noon on June 11, 2007, he suffered cardiac arrests, but was successfully resuscitated. At 2:00 p.m., he was taken to surgery in an attempt to discover whether there was an abdominal source of the infection. Mr. Murphy arrested on the operating room table and died. To this day, no one has been able to identify the cause of Mr. Murphy's infection.

\* \* \*

After learning that Dr. Fox and Patient First had settled with appellees, appellants' counsel requested by letter a copy

of the settlement agreement and release, noting that these documents had been requested in discovery and that they would "significantly impact[ ] upon [appellants'] defense strategy in this case." Appellants also suggested that they were "entitled to determine if the release is a joint tort feasor type release," and were "entitled to know the amount that Patient First paid in settlement as it will also dramatically impact upon defense strategies in this case." Counsel for Dr. Fox and Patient First responded that she would not provide copies of the requested documents, but represented that the "executed Release is a standard non-Sw[ ]igert Joint Tortfeasor Release.[1] Therefore, you need not prove your case against Dr. Fox at trial to receive a reduction." Counsel continued that "the amount of settlement with Dr. Fox is information which you are not entitled to at this time and which does not effect your trial strategy.... The only time the amount of settlement would become relevant as it relates to your client would be after a verdict against your client—so you would be able to ask the court to enter judgment for the appropriate amount (with the appropriate reduction) against your client." Dissatisfied with counsel's response, on February 22, 2010, appellants filed a "Motion for Court Order Compelling Plaintiffs to Produce the Settlement Agreement/Release Taken by Melissa Fox, M.D. and Patient First," along with a request for a hearing.

Subsequently, after learning that Dr. Utzschneider and St. Joseph's had also settled with appellees, appellants' counsel again requested by letter a copy of that settlement agreement and release. Apparently receiving no response, on March 5, 2010, appellants filed a "supplemental" motion to compel with respect to Dr. Utzschneider and St. Joseph's.

---

1. The releases provided for a contractual *pro rata* reduction without the necessity to prove joint tortfeasor status of the settling defendants. This type of release is frequently referred to as a *Jones v. Hurst*, 54 Md.App. 607, 459 A.2d 219 (1983) release, named after the decision upholding the validity of that type of release.

On March 8, 2010, appellees filed an opposition to appellants' motion to compel with respect to Dr. Fox and Patient First.

The court did not rule on any of the foregoing prior to trial, which began on March 15, 2010. On the second day of trial, March 17, 2010, the court held a hearing on appellants' motions. Appellants argued that there was a "real need" for the non-settling defendants to know the "status of a settling defendant and what type of release it is, whether a joint tortfeasor release where there is a pro rata or pro tanto reduction," and that they should not be required to accept appellees representation as to what type of release it was. Appellants' counsel suggested that the language of the release would "influence the way [he] . . . tried the case," and that appellants were also entitled to know "what the amounts are." Appellants submitted that there was "nothing more relevant to us than the amount," and that not knowing the amount impacted their ability to negotiate a settlement "intelligently." In that vein, appellants asserted that if they knew "how much has been paid, and it's a small amount, [they] may change [their] attack . . . and there may be some motivation to pay a little bit or some amount to settle this case; on the other hand, if a lot has been paid, then [they will] go forward with trial, but [they] don't know," in the absence of the disclosure of the settlement amounts.

Appellees' counsel argued that they had made a demand, and that if appellants "want[ed] to find out how much [appellees were] willing to accept and [are] willing to put money on the table, [appellees would] certainly discuss that with them." Counsel continued that if they were forced to reveal the confidential settlement amounts, it "would affect [their] settlement strategy as well," "essentially forc[ing] [them] to reveal all of [their] cards . . . .," even though the settlements were not relevant.

The court "absolutely agree[d]" that appellants were entitled to know what type of release was negotiated so that they would know how to proceed with trial. After an unrecorded

bench conference, the court granted appellants' motions as to the language of the releases, so that they could "satisfy themselves as to whether it is, in fact, a joint tort feasor release or a Swigert ... type of release," but denied them as to the monetary amount in the releases. Thus, appellees were only required to provide redacted copies of the releases. Appellants were not provided with the specific dollar amounts of the settlements until after the conclusion of trial, at which point appellants learned that Dr. Utzschneider and St. Joseph's had settled for $450,000, and Dr. Fox and Patient First had settled for $200,000. Both of the releases contained confidentiality provisions, precluding either party to the agreement from disclosing the settlement amounts with anyone.

On March 22, 2010, appellees called Dr. Tom Borzilleri, who was qualified as an "economic expert," to testify to the "estimated losses in the case." Dr. Borzilleri testified that, based on his calculations, appellees "loss of support," i.e., the income that Mr. Murphy would have produced minus his personal spending, was $525,648.00. Dr. Borzilleri explained that he calculated that number by using Mr. Murphy's 2006 W–2 form, which reported an income of $82,002.00 per year, and the Social Security Administrations ("SSA") "growth rates," which are "in the range of 3% per year." Dr. Borzilleri testified that he relied on the SSA's growth rates because it is an "objective forecast" of how much an individuals salary will increase from year-to-year. He then assumed that Mr. Murphy would work until age 66 or 67, using the "Work Life Expectancy" calculation. He explained:

> I stopped the calculation at two points, age 66 and age 67. Sixty-two is his, is the age at which he could have gotten full Social Security Retirement benefits. You can retire earlier, but you take quite a hit when you do that. You can also work later and get an 8 or 9% increase in the benefits to go beyond that age 66. But I stopped one calculation at 66. The other calculation is stopped at something called, Work Life Expectancy. Its basically a statistical estimate of how long someone of his age and education and background would have been expected to work. So, about a years

difference. That that statistic says to age 67. So, I got these earnings figures [2] that are basically saying, here's the kind of money he would have made from the day he died on out to these two stopping points.

Based on The United States Pension Benefit Guarantee Corporation's "Life Expectancy Table," Dr. Borzilleri determined that Mr. Murphy's statistical life expectancy was 23 years. Appellants' counsel did not object to any of the foregoing.

On cross-examination, Dr. Borzilleri admitted that he did not interview Mrs. Murphy or her attorneys, and admitted that he did not read her deposition in an effort to determine at what age Mr. Murphy planned to retire. He admitted that approximately 50% of "all white men who are 59 years of age in Maryland as of 2007," would live for 23 more years. He reiterated that the Life Expectancy Table provides a "statistical estimate," and reiterated that he used the SSA tables to estimate the income that Mr. Murphy would have made had he retired at 66 or 67. Dr. Borzilleri explained that he could not know at what age Mr. Murphy would retire, so he had to rely on the statistics.

When asked how much the loss of income would have been if Mr. Murphy retired at 62, Dr. Borzilleri testified that if Mr. Murphy had retired at that age, he would have only received 70% of his SSA benefits, which would have resulted in a maximum award for loss of support of $225,609.00. Had he retired at age 63, the maximum award for loss of support would have been $311,997.00. Dr. Borzilleri agreed that he had "no idea what [Mr. Murphy's] intentions were" with respect to retirement. The following colloquy ensued.

---

**2.** According to appellants, during Dr. Borzilleri's testimony, appellees' counsel "showed the jury a placard with a range of $525,648.00 to $647,650.00," but Dr. Borzilleri never testified to the latter figure. Apparently, the $525,648.00 figure represented the loss of support calculation if Mr. Murphy had retired at 66, and the $647,650.00 figure represented the loss of support calculation if Mr. Murphy had retired at 67.

DR. BORZILLERI: ... [I] ... never spoke to him prior to his death. All I can do is use the statistical information I have. And that says on average we should be looking at statistically 67. At the other hand, he could get full benefits at 66. And that's a, that's not a bad age either, but that's the best I can do.

APPELLANTS' COUNSEL: He may have been a good saver and he could have retired at 62, correct?

DR. BORZILLERI: That's true. And he could have worked to age 70 and gotten an 8% bump every year after age 67. I can't go beyond what I've got.

APPELLANTS' COUNSEL: Right. And you, so, you don't know whether he was going to retire at 61, 62, 63, 64, all the way up to 70? Just, you're giving us some numbers for the jury to consider, correct?

DR. BORZILLERI: That's correct. Statistically we've got a number and we've got the Social Security number. And if they believe its going to be shorter then they should adjust it down.

APPELLANTS' COUNSEL: And I seem to recall having cross examined a couple Economists in the past. Isn't there a study from The Social Security Administration that supports that a majority of workers retire in their 63 age, 63 year age range?

DR. BORZILLERI: 62 and 65 have always been historical ages for retirement. There have been some changes though. Again, Social Security pushed up the normal retirement age. And that tends to move people up a bit. So, 63 probably if you're going across the entire country with workers of all skill levels and all income levels that would probably be a reasonable number, age 63.

APPELLANTS' COUNSEL: All right. And so, that would be $311,997.00?

DR. BORZILLERI: That's correct. But again, below—

APPELLANTS' COUNSEL: Now—

DR. BORZILLERI:—what the work life expectancy data tells us.

\* \* \*

Mrs. Murphy testified that Mr. Murphy did not have any chronic health conditions, and that he had lost about 35 pounds in the few years preceding his death. She testified that Mr. Murphy experienced anxiety on Sunday nights or Monday mornings "about what was going to happen that week at his job because he took it very seriously." [3]

Caroline Murphy testified that she "never knew anybody . . . that liked their job more than [Mr. Murphy]," and that "he really took seriously . . . being a good boss."

Wayne Kennard, Mr. Murphy's good friend, testified that Mr. Murphy took his "family responsibilities" and his job "very seriously." Mr. Kennard stated that Mr. Murphy "was an exceptional father in the sense that he provided for his children and his wife," and that his "greatest concern was to make sure that they had all the tools and education to make it in the world and be successful." In that regard, Mr. Murphy was "always concerned about making sure he saved enough money for [his daughters] college education, they got into the right career fields and into the proper schools."

Following the jury's verdict, appellants moved for judgment notwithstanding the verdict on the issue of lost support. In the memorandum in support of their motion, appellants argued that they were entitled to judgment because there was "no evidence upon which a reasonable jury could have concluded that, more likely than not, Mr. Murphy would have worked until age 66 and/or 67 so as to sustain" the $600,000.00 award. Appellants asserted that

> [a]lthough Mrs. Murphy testified at trial, she did not provide any insight as to her husband's plans for retirement, and there was no other testimony or evidence tending to

---

3. Appellees assert that the jury heard testimony that Mr. Murphy's daughters were ages 18 and 21, and that they were both attending school and "financially dependent on their parents"; that Mrs. Murphy continued to work and "had not made any specific plans to retire"; and that the "Murphy family described Mr. Murphy as the 'breadwinner' of the family."

establish that Mr. Murphy would have worked continuously until 66, 67, or some other age. To the contrary, there was testimony that Mr. Murphy suffered acute anxiety on Sunday evenings as he anticipated the impending work week.

Likewise, on cross-exam, Dr. Borzilleri admitted that he *could not say whether Mr. Murphy would retire at 61, 62, or even whether he would have worked up until he was 70.* This revealing testimony establishes that Dr. Borzilleri was simply guessing when he testified that Mr. Murphy would have continued to work until he was 66 or 67. Indeed, Dr. Borzilleri did not express this opinion to a reasonable degree of probability and he also admitted that a majority of Americans retire at age 63. For this reason, the [appellees'] claim for loss of financial support never should have gone to the jury, and it is clear that in granting the [appellees] an award of $600,000 on this claim, the jury was required to engage in impermissible speculation and conjecture.

The jury might as well have been asked to draw numbers out of a hat.

\* \* \*

Appellees opposed the motion, arguing that appellants waived any objections to Dr. Borzilleri's opinions by failing to object during trial; that even if appellants had objected, Dr. Borzilleri's opinions were admissible because they were based on "sound, reliable economic data and statistics"; and, even without Dr. Borzilleri's opinion, there was legally sufficient evidence to support the jury's loss of support award, i.e., the testimony. Appellees also opined that Dr. Borzilleri's testimony on cross-examination—which appellants claimed was "speculative," as Dr. Borzilleri could not say at what age Mr. Murphy would have retired—went to the weight of the evidence, not to the admissibility.

On June 23, 2010, the court denied appellants' motion for judgment notwithstanding the verdict. We shall incorporate additional facts as is necessary in our discussion.

## Discussion

### 1. *Motion to Compel—Amount of Settlement Agreements*

■ Appellants make, and appellees respond to, numerous arguments pertaining to why appellants should have been able to "inspect the amounts paid by the settling health care providers prior to the judgment." While we will summarize each of the parties' arguments in that regard, we need not address each argument in detail. We explain.

Appellants overarching argument is that they should have been permitted to know the settlement amounts prior to trying the case. They also make several sub-arguments in that respect. First, appellants argue that pursuant to the Maryland Contribution Among Joint Tort–Feasors Act, Maryland Code (2006 Repl.Vol.), §§ 3–1401 *et seq.,* of the Courts & Judicial Proceedings Article, because appellants were entitled to a "credit of either the total amount paid by the settling defendants or a *pro rata* share of the judgment, whichever was greater," they "should have been permitted to discover the amount of this credit so as to engage in an intelligent assessment of the risks and benefits of proceeding to trial versus settlement." As a sub-argument, appellants assert that they should have been allowed to discover the amounts of the settlements prior to judgment because the "only Maryland case addressing the discoverability of settlement amounts by non-settling joint tortfeasors," *Porter Hayden Co. v. Bullinger,* 350 Md. 452, 713 A.2d 962 (1998), "holds in favor of disclosure." Appellants assert that pursuant to *Bullinger,* "no privilege attaches to settlement agreements or the amounts paid by joint tortfeasors" and, absent privilege, the normal relevancy rules, i.e., Maryland Rule 2–402(a), apply. Appellants reiterate that, here, the amounts paid by the settling defendants were relevant "because they would have assisted [a]ppellants and their insurer in assessing the true value of this case and the costs and benefits of proceeding to trial versus settlement." Appellants assert that under the facts of this case, because Dr. Tempel "was the least exposed" and had a causation defense, he should have spent "the least in any

potential settlement." Thus, had appellants known that Dr. Fox "was able to settle this case for $200,000," they "very well may have decided to make an offer less than or equal to that amount," as they had already decided that "losing a maximum of $360,000" [4]—their "maximum exposure at trial"—was an "acceptable risk."

Appellants also argue that, pursuant to *Bullinger*, they can demonstrate a " 'need to inspect' " the amounts of the settlement agreements because "the settlement amounts were 'usable evidence,' " as appellants would "most certainly . . . have . . . use[d] these amounts to evaluate their position in the case." Appellants also assert that non-disclosure serves no purpose other than to confer an unfair advantage on appellees. Finally, appellants argue that disclosure is consistent with the legislature's policy towards medical malpractice litigation.

Appellees counter that appellants' request to learn the settlement amounts was "completely outside the permissible scope of discovery," pursuant to Maryland Rule 2–402(a). In support of this argument, appellees assert that the settlement amounts were completely irrelevant to the only issues before the jury at trial, i.e., "whether Dr. Tempel was negligent and contributed to Mr. Murphy's death, and if so, the proper damage award," and the information sought was not reasonably calculated to lead to the discovery of admissible evidence because that information would have been barred in any event by Maryland Rule 5–408.

Furthermore, according to appellees and contrary to appellants' assertion, the ruling of the trial court ordering appellees to produce redacted copies of the settlement agreements to prove that the releases entitled appellants to a reduction in the verdict, was "entirely in line with" *Bullinger*, which in-

---

4. According to the release between appellees and Dr. Fox/Patient First, appellants were entitled to a one-share reduction in any verdict. According to the release between appellees and Dr. Utzschneider/St. Joseph's, appellants were entitled to a two-share reduction in any verdict. Thus, appellants were entitled to a total of a 3/4 reduction should the jury find against them. In other words, appellants were responsible for 1/4 of the verdict, or $360,000.

volved a post-trial discovery request. In that case, as here, opine appellees, "the amount of a judgment credit to which a joint tortfeasor is entitled is not 'relevant' until *after* a verdict" and, in fact, it was "impossible for Dr. Tempel—or anyone—to determine the 'amount of credit' until after the jury rendered its verdict."

Appellees also assert that Maryland Rule 2–402(a) does not allow for discovery "purely to assist with settlement strategy," and if appellants were "truly interested in settlement, there is no reason why" they and their counsel "could not evaluate [appellants'] risk without knowing the amounts" that appellees paid. In any event, assert appellees, even if appellants' request was within the permissible scope of discovery, "given the nature of the prejudice [appellants] believe[ ] [they] suffered—namely, the inability to settle this case for less than [their] share of the verdict—there is no remedy now available to ... cure any error or correct any prejudice." Appellees continue that the "biggest problem" with appellants' " 'settlement strategy' " argument is that "even if the amounts were discoverable for settlement purposes, there is nothing this Court can do to remedy the error" on appeal because "even if [appellants] *had* made a settlement offer, or makes one on remand, [appellees] were not, and will not be, required to accept it."

In addition to the foregoing, appellees raise a "final reason why the unredacted settlement agreements were not discoverable," namely because the settlement agreements, "by their very terms," were confidential between the parties to them. According to appellees, *Bullinger* held that, despite the confidentiality agreements at issue in that case, the release agreements were discoverable *after a verdict* on the basis that the non-settling defendant had demonstrated a " 'need to inspect' " the confidential information to obtain usable evidence, i.e., the dollar amounts of the settlement to verify that the court's verdict reduction calculation was correct. Appellees propose that unlike the defendant in *Bullinger,* appellants can not demonstrate a pre-verdict " 'need to inspect' " the amounts

contained in the confidential releases other than for simply "strategic or case evaluation purposes."

As a preliminary matter, we address the question of mootness. The test for mootness is whether a case presents a controversy between the parties for which the court can fashion an effective remedy. *Hamot v. Telos Corp.*, 185 Md.App. 352, 360, 970 A.2d 942 (2009). If otherwise moot, a court may address an issue if it is capable of repetition but is likely to evade review, *id.* at 363, 970 A.2d 942, or it is necessary to prevent harm to the public interest. *Id.* at 366, 970 A.2d 942. We conclude that, while the issue presented is moot, it is capable of repetition and is likely to evade review. Thus, we shall address the issue on its merits.

At the outset, we note that pursuant to Maryland Rule 2–402(a),

[a] party may obtain discovery regarding any matter that is not privileged, including the existence, description, nature, custody, condition, and location of any documents ... and tangible things ... *if the matter sought is relevant to the subject matter involved in the action, whether it relates to the claim or defense of the party seeking discovery or to the claim or defense of any other party.* It is not ground for objection that the information sought is already known to or otherwise obtainable by the party seeking discovery or that the information will be inadmissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence.

\* \* \*

(Emphasis added). Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Maryland Rule 5–401. The admissibility of evidence, including rulings on relevance, is left to the sound discretion of the trial court, and absent a showing of abuse of that discretion, its

rulings will not be disturbed on appeal. *Dehn v. Edgecombe,* 384 Md. 606, 628, 865 A.2d 603 (2005).

Maryland courts

have noted that the purpose of the discovery rules is to require the disclosure of *facts* by a party litigant to all of his adversaries, and thereby to eliminate, as far as possible, the necessity of any party to litigation going to trial in a confused or muddled state of mind, *concerning the facts that gave rise to the litigation.* If all of the parties have knowledge of all of the relevant, pertinent and non-privileged facts, or the knowledge of the existence or whereabouts of such facts, the parties should be able properly to prepare their claims and defenses, thereby advancing the sound and expeditious administration of justice.

*Bullinger,* 350 Md. at 460, 713 A.2d 962 (collecting cases) (second emphasis added).

Absent some fact in a given case that would change the result, the settlement amount contained in a joint tortfeasor release is not relevant at the pre-verdict stage. Here, the settlement amounts did not, in any way, concern the facts relevant to a determination of appellants' liability or the amount of any damages; thus, they were not relevant at the pre-verdict stage. As in *Bullinger,* the information sought by appellants did not become relevant until after the verdicts were rendered, and the amounts were necessary to determine the apportionment of damages as to each party under the Maryland Contribution Among Joint Tort–Feasors Act. *See Bullinger,* 350 Md. at 463, 713 A.2d 962 (citing *Bottaro v. Hatton Associates,* 96 F.R.D. 158 (E.D.N.Y.1982) (providing that only after final judgment has been rendered will the full liability of all defendants be known, and the pro rata share owed by each party ascertained)). Even after final judgment, however, "the settlement would not be evidence relevant to any issue in [the] case other than the ministerial apportionment of damages . . . ." *Bullinger,* 350 Md. at 463, 713 A.2d 962 (quoting *Bottaro,* 96 F.R.D. at 160).

In contrast, the terms of the jointfeasor releases, other than the amount of consideration, were relevant pre-trial because the nature of the release would determine whether appellants, if liable, would get an automatic *pro rata* reduction or whether the jointfeasor status of the settling parties would have to be adjudicated. That information was provided to appellants. At the stage in the proceedings in which the settlement amounts became relevant, appellants were provided with the pertinent information, and they make no assertion on appeal that the amount apportioned to them was in error. We will not disturb the court's ruling.

### 2. *Judgment Notwithstanding the Verdict— Loss of Support Award*

■ Appellants next argue that the court erred by denying their motion for judgment notwithstanding the verdict "as to the speculative nature of the jury's award for loss of Mr. Murphy's financial support," because appellees "failed to prove this element of their claim." According to appellants, the award of $600,000 was "overly speculative" because there was "no evidence upon which the jury could have concluded that Mr. Murphy would have retired at age 66 or 67," rather than 61, or 62, or 70.

Appellees respond that appellants' objection is unpreserved because they "did not make a *single* objection," pursuant to Maryland Rule 2–517, during Dr. Borzilleri's testimony; they did not move to strike any of Dr. Borzilleri's testimony; and, they did not make a motion for judgment, pursuant to Maryland Rule 2–532, on the issue of whether direct testimony regarding the age at which Mr. Murphy intended to retire was necessary in order to recover for lost financial support. Appellees continue that, in any event, even if the issue was properly preserved, "Maryland law ... does not require the family members of a deceased plaintiff to prove the specific age at which the decedent would have retired to recover lost financial support," nor would Mr. Murphy's statement to his family members, had he made one, regarding when he intended to retire, have been admissible; thus, the "direct evidence"

appellants suggest is necessary would have been impossible to obtain. For that reason, Dr. Borzilleri's expert testimony, which was based upon "two data sets commonly used by, referred to, and relied on by economists when determining average work-life expectancy," was helpful to assist the jury in calculating future losses. Moreover, appellees opine that Dr. Borzilleri's testimony on cross-examination that "he could not say for certain whether Mr. Murphy would retire at 61, 62, or even whether he would have worked until he turned 70, go to the weight of the opinions, not their admissibility." Finally, appellees suggest that even without Dr. Borzilleri's testimony, the evidence before the jury, specifically the testimony of Mrs. Murphy and Wayne Kennard, supported the jury's award.

With respect to the issue of preservation, we have not been provided with the transcript of trial. In appellants' reply brief, they included two pages of transcript which appear to include a motion for judgment by appellants at the close of all of the evidence. In support of the motion, appellants argued that the loss of support claim was speculative because there was no testimony as to when Mr. Murphy planned to retire. A comment by the court indicates that appellants moved for judgment at the close of appellees' case and made the same argument. Based on the two pages of transcript in the reply brief, we conclude that the issue was raised on a motion for judgment and, thus, could properly be raised in a motion for judgment notwithstanding the verdict. Appellants' failure to object to Dr. Borzilleri's testimony does not constitute a waiver because appellants are challenging legal sufficiency to support the claim, not admissibility.

Turning to the merits, we agree with appellees that they did not have to prove a specific age of retirement. In addition to Dr. Borzilleri's testimony, the jury heard testimony by Mrs. Murphy, Caroline Murphy, and Mr. Kennard, describing Mr. Murphy prior to the events which gave rise to this lawsuit. The jury could consider the totality of the evidence, including Mr. Murphy's age, health, employment, financial situation, and general population statistics, *i.e.*, life expectancy

and work life expectancy, to determine the amount of lost support.

**JUDGMENTS AFFIRMED. COSTS TO BE PAID BY APPELLANTS.**