61 A.3d 767

CSX TRANSPORTATION, INC.

v.

**Edward L. PITTS, Sr.**

**No. 34, Sept. Term, 2012.**

Court of Appeals of Maryland.

Feb. 28, 2013.

432

434

Andrew E. Tauber (Evan M. Tager, Carl J. Summers, Paul W. Hughes of Mayer Brown LLP, Washington, DC; Mitchell Y. Mirviss of Venable LLP, Baltimore, MD; C. Stephen Setliff of Setliff & Holland, PC, Glen Allen, VA; J. Christopher Nosher of Setliff & Holland, PC, Annapolis, MD), on brief, for petitioner.

P. Matthew Darby and H. David Leibensperger of Berman, Sobin, Gross, Feldman & Darby LLP, Towson, MD; C. Richard Cranwell of Cranwell, Moore & Emick, PLC, Roanoke, VA, on brief, for respondent.

Louis P. Warchot, Daniel Saphire, Association of American Railroads, Washington, DC, James W. Constable, Wright, Constable & Skeen, L.L.P., Baltimore, MD, for amicus curiae brief of the Association of American Railroads in Support of Petitioner.

Lawrence M. Mann, Alper & Mann, PC, Bethesda, MD, for amici curiae brief of Rail Labor Division of the Transportation Trades Department, AFL–CIO, and the Rail Conference of the International Brotherhood of Teamsters.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, ADKINS, BARBERA and McDONALD, JJ.

ADKINS, J.

This negligence case, brought under the Federal Employers Liability Act ("FELA"), presents several issues not found in a typical negligence claim, but of growing significance nationwide. The issue that has been drawing most of the courts' time and attention is federal preclusion—whether and when a railroad employee's negligence action under FELA may be

precluded by the Federal Railroad Safety Act ("FRSA") and regulations enacted thereunder. Here, we are asked to decide whether a regulation governing the railroad's use of ballast to support railroad tracks precludes a FELA action that alleges the railroad was negligent in failing to use small ballast in its walkways, so as to provide a smoother and safer walking surface for employees.[1] We join those courts that hold that a negligence action alleging the improper use of ballast will be precluded only to the extent to which the ballast performs a track-support function. In so doing, we conclude that the railroad should, fairly, bear the burden of proving the facts that support preclusion. We also address complaints about two jury instructions and the trial court's rulings on the defense's efforts to cross-examine the plaintiff's expert economist regarding industry-wide worklife expectancy.

## FACTS AND LEGAL PROCEEDINGS

Edward L. Pitts, Sr., filed suit in the Circuit Court for Baltimore City against his employer CSX Transportation, Inc. ("CSX") under FELA, alleging that CSX was negligent in its use of large ballast rather than small ballast in the areas where Pitts worked. Pitts claimed that walking on the large ballast caused him to develop severe osteoarthritis in both knees.

Pitts began working for CSX at the age of 19 and was 59 at the time of trial. He testified that, from June to September of 1970, he worked in the track department, where he was required to walk along the tracks installing anticreeper devices. From December 1972 to June 1974, Pitts worked as a

---

1. "Ballast" is a technical term used by the railroad industry to denote, what would otherwise be commonly known as, crushed rock. There are two different grades of ballast. Large ballast—also termed main-line ballast, track ballast, or road ballast—ranges in size between approximately 1″ to 2 3/4″ in diameter. Small ballast—also termed walkway ballast or yard ballast—ranges in size between approximately 3/8″ to 1″ in diameter. The two grades of ballast serve different functions. Large ballast is used to support the railroad tracks and facilitate drainage. Small ballast is better suited for walking surfaces than large ballast.

conductor and brakeman. During that time period, he walked between five to six miles a day, was required to disassemble the brakes, and dismounted moving equipment. From June 1974 till the late 1990s, Pitts worked as a fireman, hostler, conductor, and brakeman. In these positions, he walked between two to three miles a day, would inspect the trains before they left the yard, connected and disconnected the engines, coupled and uncoupled air hoses, and threw the switches to change the direction of the train from one track to the other. From the late 1990s until trial, Pitts worked as an engineer. He walked between half-a-mile to a mile-and-a-half a day and inspected the engines.

Despite feeling pain in his knees as early as 2003, Pitts did not see a doctor until 2007. At that time, he had grade 3 osteoarthritis, torn meniscus tissue in both knees, and extremely worn cartilage. In 2007, the doctor suggested knee surgery, but Pitts initially declined, until early 2008 when he underwent arthroscopic surgery on both knees. After missing five months due to the surgeries, Pitts returned to work and was still employed as of the date of trial.

At trial, Pitts testified that he had hoped to work until the age of 68 because his daughter is a single parent, and he wanted to help put his grandson through college. In calculating Pitts's loss of future earnings, his expert economist assumed a retirement age of 67 based on information provided by Pitts's lawyer. CSX sought to show that Pitts would not have worked until the age of 68 by cross-examining the expert economist regarding statistics about the average age of railroad workers' retirement (allegedly age 60). The trial court allowed only limited questioning of this nature.

After a six-day trial, the jury returned a verdict in Pitts's favor, finding CSX seventy percent negligent, Pitts twenty percent negligent, and allocating ten percent to other causes. The jury awarded Pitts a total of $1,780,000 for his injuries—$444,000 for future loss wages and $1,335,000 for non-economic damages. The award was subsequently reduced to $1,246,000 according to the jury's allocation of negligence.

The Court of Special Appeals affirmed. In a reported opinion authored by Judge Watts, the intermediate appellate court held that Pitts's ballast claim was not precluded by federal law, the trial court did not abuse its discretion in limiting the use of the retirement statistics on cross-examination, and CSX was not prejudiced by two allegedly erroneous jury instructions. *CSX Transp., Inc. v. Pitts,* 203 Md.App. 343, 371, 389, 391–93, 38 A.3d 445, 461–62, 471–72, 473–74 (2012).

On June 21, 2012, this Court granted a writ of certiorari, *CSX Transportation v. Pitts,* 427 Md. 62, 46 A.3d 404 (2012), to answer the following questions:

1. Whether the federal regulation governing the ballast used to support railroad track, 49 C.F.R. § 213.103, applies to track located within rail yards (and therefore precludes claims based on the selection of ballast used to support track in rail yards), or, as the Court of Special Appeals held, applies only to track on the main line.

2. Whether the Court of Special Appeals acted contrary to the Supreme Court's decision in *Norfolk Southern Railway v. Sorrell,* 549 U.S. 158, 171 [127 S.Ct. 799, 166 L.Ed.2d 638] (2007), when it adopted "an employee-friendly standard of review" in FELA cases.

3. Whether a defendant should be allowed to cross-examine a plaintiff's economist about work-life statistics which show that the plaintiff's claim for future economic damages is likely exaggerated because it rests on an unrealistic assumption about when the plaintiff likely would have retired.

As CSX explained in its petition for certiorari and brief, the crux of the second issue is the intermediate appellate court's review of two allegedly erroneous jury instructions.

We shall hold first that Pitts's FELA claim was not precluded by 49 C.F.R. § 213.103 because CSX failed to prove that the claim was based on ballast performing a track-support function. Second, neither of the jury instructions rises to the level of prejudicial error. Finally, the trial judge did not

abuse his discretion in limiting, without banning, questions about worklife expectancy tables on cross-examination.

## DISCUSSION

In this appeal, CSX has requested three alternative forms of relief. First, it asks for judgment as a matter of law, arguing that a FRSA regulation substantially subsumes the railroad's choice of ballast to support its tracks, and thereby, precludes Pitts's negligence claim under FELA. Second, CSX seeks a new trial, claiming that two jury instructions—explaining Congress's purpose behind enacting FELA and stating that violation of a statute is evidence of negligence—were both erroneous and prejudicial. Third, CSX asks for a new trial on the issue of damages, arguing that the trial court committed prejudicial abuse of discretion in limiting the cross-examination of an expert economist. We will take each in turn.

### FRSA's Preclusive Effect Upon Negligent–Choice– of–Ballast Claims Under FELA

CSX seeks to use the doctrine of preclusion to prevent Pitts, as a matter of law, from recovering on his claim that CSX negligently used large ballast, instead of small ballast, in the areas in which he was required to walk to perform his work duties.[2] Specifically, CSX argues that FRSA regulation 49 C.F.R. § 213.103 covers the issue of ballast choice and thereby precludes Pitts from bringing a FELA negligence action based on CSX's choice of ballast in its yards. To determine the potential preclusive effect of this regulation, we first examine the interplay between the two federal statutes: FELA, which authorizes negligence suits against railroads by

---

**2.** Large ballast is more likely to cause injury because the larger rocks create an uneven surface that is more difficult to walk on. As Pitts testified, "walking on large ballast is sort of like walking on marbles sometimes. It gives out underneath your feet; your feet roll and you slip and slide." Pitts's medical experts testified that, over time, repetitive force caused by walking on large ballast can lead to chronic lower extremity injuries, and that the osteoarthritis in both of his knees was caused by his work-related activities.

their employees, and FRSA, which is designed to promote safety through uniform national regulations. We then determine the extent to which 49 C.F.R. § 213.103 may preclude a FELA negligence claim based on a railroad's choice of ballast. Finally, we decide whether CSX has met its burden of proving that 49 C.F.R. § 213.103 precluded Pitt's FELA claim.

### FELA and FRSA

Congress enacted FELA in 1908 "to provide a remedy to railroad employees injured as a result of their employers' negligence." *Waymire v. Norfolk & W. Ry. Co.*, 218 F.3d 773, 775 (7th Cir.2000). Under the Act, "[e]very common carrier by railroad while engaging in [interstate] commerce . . . shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce . . . for such injury or death resulting in whole or in part from the negligence . . . of such carrier. . . ." 45 U.S.C. § 51 (2006). Interpreting the Act, the Supreme Court has made "clear that the general congressional intent was to provide liberal recovery for injured workers." *Kernan v. Am. Dredging Co.*, 355 U.S. 426, 432, 78 S.Ct. 394, 398, 2 L.Ed.2d 382 (1958). As such, "[t]he Act is not to be narrowed by refined reasoning. . . . It is to be construed liberally to fulfill the purposes for which it was enacted. . . ." [3] *Jamison v. Encarnacion*, 281 U.S. 635, 640, 50 S.Ct. 440, 442, 74 L.Ed. 1082 (1930).

In 1970, Congress enacted FRSA "to promote safety in every area of railroad operations and reduce railroad-related accidents and incidents." 49 U.S.C. § 20101 (2006). FRSA authorizes the Secretary of Transportation to "prescribe regulations and issue orders for every area of railroad safety." *Id.* § 20103(a). The Act provides that "[l]aws, regulations, and orders related to railroad safety . . . shall be nationally uni-

---

**3.** Under the statute, jurisdiction to hear a FELA case is shared between the federal and state courts. *See* 45 U.S.C. § 56 (2006). "As a general matter, FELA cases adjudicated in state courts are subject to state procedural rules, but the substantive law governing them is federal." *St. Louis Sw. Ry. Co. v. Dickerson*, 470 U.S. 409, 411, 105 S.Ct. 1347, 1348, 84 L.Ed.2d 303 (1985).

form to the extent practicable." *Id.* § 20106(a)(1). The regulation at issue in this case, 49 C.F.R. § 213.103, was adopted under the authority of FRSA. Under FRSA's express preemption clause, "[a] State may adopt or continue in force a law, regulation, or order related to railroad safety or security until the Secretary of Transportation . . . prescribes a regulation or issues an order **covering** the subject matter of the State requirement." *Id.* § 20106(a)(2) (emphasis added).

FRSA does not explain how it interacts with another federal statute covering the same subject matter. *See Cowden v. BNSF Ry. Co.*, 690 F.3d 884, 890 (8th Cir.2012). Nevertheless, CSX asks us to hold that FRSA *precludes* a federal negligence suit under FELA to the same extent it would *preempt* a state law negligence claim.[4] This interpretation would mean applying the test enunciated by the Supreme Court in *CSX Transportation, Inc. v. Easterwood*, 507 U.S. 658, 113 S.Ct. 1732, 123 L.Ed.2d 387 (1993). Under the *Easterwood* test, the railroad would be required to "establish more than that [the FRSA regulations] 'touch upon' or 'relate to' that subject matter, [because] 'covering' is a more restrictive term which indicates that pre-emption will lie only if the federal regulations **substantially subsume** the subject matter of the relevant state law." *Id.* at 664, 113 S.Ct. at 1738 (citation omitted) (emphasis added). Many courts, especially in more recent cases, have adopted this federal-state law preemption test for the purposes of analyzing whether FRSA precluded a federal negligence suit. *See, e.g., Nickels v. Grand Trunk W. R.R., Inc.*, 560 F.3d 426, 430 (6th Cir.2009); *Lane v. R.A. Sims, Jr., Inc.*, 241 F.3d 439, 443 (5th Cir.2001); *Waymire*, 218 F.3d at 776; *McCain v. CSX Transp., Inc.*, 708 F.Supp.2d 494, 501–04 (E.D.Pa.2010); *Davis v. Union Pac. R.R. Co.*, 598 F.Supp.2d 955, 956–60 (E.D.Ark.2009); *DeHahn*

---

4. For an explanation of how the doctrines of preclusion and preemption differ, see *CSX Transportation, Inc. v. Miller*, 159 Md.App. 123, 161–65, 858 A.2d 1025, 1047–49 (2004). Although preclusion and preemption are different concepts, cases deciding the preemptive effect of FRSA can be instructive in determining whether FRSA precludes a plaintiff's FELA claim. *Id.* at 165, 858 A.2d at 1049.

*v. CSX Transp., Inc.,* 925 N.E.2d 442, 450 (Ind.Ct.App.2010); *Booth v. CSX Transp., Inc.,* 334 S.W.3d 897, 900–01 (Ky.Ct. App.2011).[5] Others expressed doubt FRSA can ever preclude a FELA claim. *See, e.g., Grimes v. Norfolk S. Ry. Co.,* 116 F.Supp.2d 995, 1003 (N.D.Ind.2000); *Earwood v. Norfolk S. Ry. Co.,* 845 F.Supp. 880, 891 (N.D.Ga.1993); *Myers v. Ill. Cent. R.R. Co.,* 323 Ill.App.3d 780, 257 Ill.Dec. 365, 753 N.E.2d 560, 565 (2001).

We need not decide whether a FRSA regulation can ever preclude a FELA claim because a close analysis of the record assures us that, even if we applied the state law preemption standard, the Circuit Court did not err in denying CSX's motion for judgment. We explain.

### *Preclusion of a Negligence Claim Based on a Railroad's Choice of Ballast*

Under the state law preemption test CSX wants us to apply in the federal context, a FRSA regulation would preclude a FELA negligence claim only if the regulation "covers" or "substantially subsumes" the subject matter of the claim. *See Easterwood,* 507 U.S. at 664, 113 S.Ct. at 1738. Pitts's FELA claim alleges that CSX was negligent in its choice of ballast in its yards. Thus, for his claim to be precluded, there must be a FRSA regulation covering a railroad's use of ballast.

CSX relies on 49 C.F.R. § 213.103, which is the only FRSA regulation to discuss the use of ballast, namely the use of ballast for the purposes of supporting railroad track. It reads as follows:

Unless it is otherwise structurally supported, all track shall be supported by material which will—

(a) Transmit and distribute the load of the track and railroad rolling equipment to the subgrade;

---

**5.** Two other circuits have acknowledged these cases but stopped short of fully endorsing the expansion of *Easterwood* into federal preclusion. *See Cowden v. BNSF Ry. Co.,* 690 F.3d 884, 890–92 (8th Cir.2012); *Tufariello v. Long Island R.R. Co.,* 458 F.3d 80, 86 (2d Cir.2006).

(b) Restrain the track laterally, longitudinally, and vertically under dynamic loads imposed by railroad rolling equipment and thermal stress exerted by the rails;

(c) Provide adequate drainage for the track; and

(d) Maintain proper track crosslevel, surface, and [alignment].

49 C.F.R § 213.103.

CSX claims there "is no dispute" that this regulation "substantially subsumes the subject of the ballast that is used to support railroad track." In making that statement, CSX relies primarily on a recent Sixth Circuit case, *Nickels v. Grand Trunk Western Railroad, Inc.* In that case, two railroad employees sued Grand Trunk for "fail[ing] to provide a safe working environment by using large mainline ballast—instead of smaller yard ballast—underneath and adjacent to tracks receiving heavy foot traffic." 560 F.3d at 428. The Sixth Circuit held that 49 C.F.R. § 213.103 "leaves the matter [of ballast size] to the railroads' discretion so long as the ballast performs the enumerated support functions. In this way, the regulation substantially subsumes the issue of ballast size." *Id.* at 431. Because both employees alleged negligence in using large ballast "*to support the railroad track*," but not "in areas completely separate from those where track stability and support are concerned," their claims were precluded by the regulation. *Id.* at 432–33.

CSX argues further that "many courts have concluded that the [Federal Railroad Administration's ("FRA")] ballast regulation 'substantially subsumes' the subject of—and therefore precludes—FELA claims such as [Pitts's] that are based on the use of allegedly oversized ballast to support track structure." CSX cites a number of cases standing for this proposition, including *Brenner v. Consolidated Rail Corp.*, 806 F.Supp.2d 786, 796 (E.D.Pa.2011); *McCain*, 708 F.Supp.2d at 504; and *Norris v. Cent. of Ga. R.R. Co.*, 280 Ga.App. 792, 635 S.E.2d 179, 183 (2006).

Responding, Pitts relies on two Court of Special Appeals' opinions—*CSX Transportation, Inc. v. Miller* and *CSX Trans-*

*portation, Inc. v. Bickerstaff*—to argue that 49 C.F.R. § 213.103 does not preclude FELA claims based on negligent use of ballast in walkways. In *Miller*, like this case, the railroad employee filed suit under FELA to recover "for bilateral osteoarthritis of the knees caused by cumulative trauma occurring over the period of his employment with CSX." 159 Md.App. 123, 146, 858 A.2d 1025, 1038 (2004). In that case, CSX argued that any claim of injury caused by the use of ballast was precluded under 49 C.F.R. § 213.103. The Court of Special Appeals disagreed, stating:

> Even a surface glance at the FRSA regulation relied on by CSX persuades us that it does not touch, let alone pervasively cover, the railroad yard conditions that allegedly fell short of the safe and healthy workplace environment that CSX was obligated to provide for its employees. The regulation is concerned with the track and its immediately adjoining area and not with railroad yards.

*Id.* at 167, 858 A.2d at 1050. The court held that the employee's FELA claim was not precluded because 49 C.F.R. § 213.103 does not cover the issue of walkways alongside the tracks. *Id.* at 171, 858 A.2d at 1052.

Likewise, *Bickerstaff* involved nine railroad employees who filed suit under FELA seeking recovery for knee injuries resulting from "walking on the rocks, or ballast, that makes up the surfaces of [CSX's] rail yards." 187 Md.App. 187, 201, 978 A.2d 760, 768 (2009). There, CSX argued that *Miller* was wrongly decided and reasserted its claim that the employees' claims of injury caused by walking on the ballast were precluded by 49 C.F.R. § 213.103. *Id.* at 260–61, 978 A.2d at 802–03. In support of that argument, CSX relied primarily on a Georgia Court of Appeals' case which held: "To the extent that [the employee's] FELA claim rests upon different ways by which [the railroad] might have supported *the mainline track* to comply with 49 C.F.R. § 213.103, the negligence claim is precluded." *Id.* at 261, 978 A.2d at 803 (quoting *Norris,* 635 S.E.2d at 183) (quotation marks omitted).

But the Court of Special Appeals concluded that *Norris* was "entirely consistent with [its] decision in *Miller* [which] recognized that 49 C.F.R. § 213.103 governs the ballast along *the mainline track* and not *the ballast in the rail yard.*" *Id.* at 262–63, 978 A.2d at 803–04. Affirming its holding in *Miller*, the *Bickerstaff* court held that the employees' claims were not precluded because they were based on "maintaining safe walkways in the rail yards and make no mention of alternate ways in which [CSX] might have supported its mainline track." *Id.* at 263–64, 978 A.2d at 804.

As further support, Pitts argues that "at least 10 published opinions outside Maryland have held that 49 C.F.R. § 213.103 has no preclusive effect on FELA negligent walkway ballast choice claims or, in the case of state regulations, no preemptive effect on state ballast regulations." [6]

In debating whether Pitts's claim is precluded, it is clear that the parties are talking past one another. CSX argues that 49 C.F.R. § 213.103 precludes any claim that it was negligent in its choice of ballast to support the tracks. Pitts argues that 49 C.F.R. § 213.103 does not preclude his claim that CSX was negligent in its choice of non-support ballast used in walkways. Both positions are correct.

■ We agree with CSX that 49 C.F.R. § 213.103 "covers" and "substantially subsumes" the use of ballast that supports the track. As the Sixth Circuit noted in *Nickels:* "Rather than prescribing ballast sizes for certain types or classes of track, the regulation leaves the matter to the railroads' discretion **so long as the ballast performs** the enumerated **support**

---

6. *See Norfolk S. Ry. Co. v. Box,* 556 F.3d 571, 572–73 (7th Cir.2009); *Davis v. Union Pac. R.R. Co.,* 598 F.Supp.2d 955, 958–59 (E.D.Ark. 2009); *Grogg v. CSX Transp., Inc.,* 659 F.Supp.2d 998, 1014–15 (N.D.Ind.2009); *Grimes v. Norfolk S. Ry. Co.,* 116 F.Supp.2d 995, 1002–03 (N.D.Ind.2000); *S. Pac. Transp. Co. v. Pub. Util. Comm.,* 647 F.Supp. 1220, 1225 (N.D.Cal.1986); *Elston v. Union Pac. R.R. Co.,* 74 P.3d 478, 488 (Colo.App.2003); *DeHahn v. CSX Transp., Inc.,* 925 N.E.2d 442, 450–52 (Ind.App.2010); *Booth v. CSX Transp., Inc.,* 334 S.W.3d 897, 901 (Ky.App.2011); *Ill. Cent. Gulf R.R. Co. v. Tenn. Pub. Serv. Comm.,* 736 S.W.2d 112, 116–17 (Tenn.App.1987); *Hendrix v. Port Terminal R.R. Ass'n,* 196 S.W.3d 188, 201 (Tex.App.2006).

**functions.**" 560 F.3d at 431 (emphasis added). By directing
"railroads to install ballast sufficient to perform key [track]
support functions ..., [49 C.F.R. § 213.103] effectively nar-
rows the universe of material the railroad may use in a given
situation. The regulation thus determines what is a reason-
able ballast composition and size for a particular track." *Id.*
Accordingly, the regulation "covers" and "substantially sub-
sumes" any claim alleging negligent choice of ballast when the
ballast performs a track-support function.

 We also agree with Pitts, however, that 49 C.F.R.
§ 213.103 does not "cover" or "substantially subsume" the use
of ballast in walkways that do not perform a track-support
function. As Chief Judge Easterbrook of the Seventh Circuit
recently stated: "no federal regulation deals with walkways."
*Norfolk S. Ry. Co. v. Box,* 556 F.3d 571, 572 (7th Cir.2009);
*see also Grimes,* 116 F.Supp.2d at 1002–03 ("Every circuit that
has considered the issue of walkways has concluded that the
FRSA is silent on the question of walkways. The regulations
are directed toward creating a safe roadbed for trains, not a
safe walkway for railroad employees who must inspect the
trains.").

This is made clear by the FRA's decision in 1977 not to
adopt federal walkway rules. *See Box,* 556 F.3d at 573. In
1976, FRA contemplated issuing rules about walkways and
asked for comments about whether walkways adjacent to
railroad tracks should be required. *Id.* (citing 41 Fed.Reg.
50,302 (1976)). FRA decided not to adopt any regulations
regarding the issue of walkways, stating that, "if an employee
safety problem does exist because of the lack of walkways in a
particular area or on a particular structure, regulation by a
State agency that is in a better position to assess the local
need is the more appropriate response." *Id.* (quoting 42
Fed.Reg. 22, 184–85 (1977)) (quotation marks omitted).

Reviewing the cases, it appears that almost every court to
have addressed the issue, including our own Court of Special
Appeals, has agreed that 49 C.F.R. § 213.103 does not pre-
clude claims based on ballast used in walkways. *See Bicker-
staff,* 187 Md.App. at 263–64, 978 A.2d at 804; *Miller,* 159

Md.App. at 170–71, 858 A.2d at 1052; *see also Box*, 556 F.3d at 572–73; *Davis*, 598 F.Supp.2d at 958–59; *Grogg v. CSX Transp., Inc.*, 659 F.Supp.2d 998, 1014–16 (N.D.Ind.2009); *Grimes*, 116 F.Supp.2d at 1002–03; *S. Pac. Transp. Co. v. Pub. Util. Comm.*, 647 F.Supp. 1220, 1224–25 (N.D.Cal.1986); *Elston v. Union Pac. R.R. Co.*, 74 P.3d 478, 488 (Colo.App. 2003); *DeHahn*, 925 N.E.2d at 450–52; *Booth*, 334 S.W.3d at 901; *Ill. Cent. Gulf R.R. Co. v. Tenn. Pub. Serv. Comm.*, 736 S.W.2d 112, 116–17 (Tenn.App.1987); *Hendrix v. Port Terminal R.R. Ass'n*, 196 S.W.3d 188, 201 (Tex.App.2006). Indeed, even *Nickels*, the case most heavily relied on by CSX, recognized that 49 C.F.R. § 213.103 precludes claims based on the use of ballast only "so long as the ballast performs the enumerated support functions." 560 F.3d at 431.[7]

### *Proving that the Ballast Performed a Track–Support Function*

██ Because it is clear that 49 C.F.R. § 213.103 precludes only claims pertaining to the use of ballast for the purposes of

---

**7.** CSX further argues that in this case the Court of Special Appeals "inexplicably" reached the "unprecedented" holding that 49 C.F.R. § 213.103 does not apply within the entire rail yard. CSX selectively quotes several instances of the Court of Special Appeals' opinion where it held that the regulation does not cover, substantially subsume, or preclude "ballast used in rail yards." Noticeably omitted from all of these quotes, however, is the court's immediately following reference to "walkways." The opinion said: "we conclude that the plain language of 49 C.F.R. § 213.103 demonstrates that the regulation applies to ballast used for track support. We find no merit in [CSX's] argument that the FRSA regulation 'covers' or 'substantially subsumes' the issue of ballast used in rail yards and on walkways." *CSX Transp., Inc. v. Pitts*, 203 Md.App. 343, 369, 38 A.3d 445, 460 (2012). Likewise, the intermediate appellate court reiterated that "the regulation concerns the track itself and not conditions of rail yards or walkways." *Id.* at 370, 38 A.3d at 461.

When examined in its complete context, we do not agree with CSX's reading of the intermediate appellate court's opinion. The Court of Special Appeals used the terms "rail yards" and "walkways" in conjunction with each other to represent areas of ballast not performing a track-support function. This is made clear by the court's explicit holding that 49 C.F.R. § 213.103 does preclude a claim involving ballast performing a track-support function. Thus, CSX's claims in this regard are misplaced.

supporting railroad track but not its use in the walkway areas, the true contention between the parties is not what 49 C.F.R. § 213.103 precludes, but whether Pitts's claim was based on ballast that performed a track-support function, or ballast that served only as a walkway unrelated to track support. A resolution of this issue requires us to examine who has the burden of proof, and exactly what was proved at trial.

### Allocation of the Burden of Proof

In determining who bears the burden of proving that a claim is, or is not, precluded by a federal regulation, the Supreme Court has provided guidance. In *Easterwood*, the case which CSX urges us to follow, the Supreme Court held:

> To prevail on the claim that the regulations have preemptive effect, [the railroad company] must establish more than that they "touch upon" or "relate to" that subject matter . . ., for "covering" is a more restrictive term which indicates that preemption will lie only if the federal regulations substantially subsume the subject matter of the relevant state law. (Citation omitted).

507 U.S. at 664, 113 S.Ct. at 1738. So, if a railroad company argues that a FELA claim is precluded by a FRSA regulation, then it has the burden of proving that such a regulation "substantially subsumes" the particular FELA claim. *See Cowden,* 690 F.3d at 892–93 (taking this language from *Easterwood* and placing the burden of proof on the railroad company advocating preclusion of a FELA claim by a FRSA regulation).

■ Federal preclusion, like its counterpart in federal preemption, is an affirmative defense. *See Duluth, Winnipeg & Pac. Ry. Co. v. City of Orr,* 529 F.3d 794, 797 (8th Cir.2008) ("It is the burden of the party advocating preemption under § 20106(a)(2) to show that a federal law, regulation, or order covers the same subject matter as the state law, regulation, or order it seeks to preempt."); *Fifth Third Bank v. CSX Corp.,* 415 F.3d 741, 745 (7th Cir.2005) ("Federal preemption is an affirmative defense upon which the defendants bear the bur-

den of proof."); *Village of Ridgefield Park v. N.Y., Susquehanna & W. Ry. Corp.,* 318 N.J.Super. 385, 724 A.2d 267, 272 (App.Div.1999) ("The railroad raises preemption as an affirmative defense and has the burden of persuasion to demonstrate the [plaintiff's] claims are indeed preempted."). This Court has long held that "with all affirmative defenses, [the defendant] bears the burden of proof." *Wells Fargo Home Mortg., Inc. v. Neal,* 398 Md. 705, 730 n. 12, 922 A.2d 538, 553 n. 12 (2007).[8] Indeed, even CSX conceded at oral argument that it bore the burden of proving that Pitts's FELA claim was precluded.

Requiring CSX to prove that Pitts's FELA claim is precluded by 49 C.F.R. § 213.103 "is consistent with the 'rule grounded in common sense that the burden of proving a fact is on the party who presumably has peculiar means of knowledge' enabling him or her to establish the fact." *Arrington v. Dep't of Human Res.,* 402 Md. 79, 102, 935 A.2d 432, 446 (2007) (citation omitted). As CSX maintains the track-support structure, it is in a far better position to prove which part of the ballast supports the track and which does not.[9]

---

**8.** This rule is also well recognized in the secondary sources. *See* Paul V. Niemeyer & Linda M. Schuett, *Maryland Rules Commentary* 216 (3d ed. 2003) ("[W]hen an affirmative defense is raised by the defendant, the defendant has the burden of persuasion."); 5 Lynn McLain, *Maryland Practice: Maryland Evidence State & Federal* § 300:1 (2d ed. 2001) ("Generally, the party who asserts the affirmative of an issue bears the burden of proving it. . . .").

**9.** Likewise, this allocation of the burden is supported by the general rules applicable to affirmative defenses. An affirmative defense is "[a] defendant's assertion of facts and arguments that, if true, will defeat the plaintiff's or prosecution's claim, even if all the allegations in the complaint are true." *Black's Law Dictionary* 482 (Bryan A. Garner et al. eds., 9th ed.2009); *see also Zeller v. Greater Balt. Med. Center,* 67 Md.App. 75, 89, 506 A.2d 646, 654 (1986) ("We defined the term 'affirmative defense' . . . as 'one which directly or implicitly concedes the basic position of the opposing party, but which asserts that notwithstanding that concession the opponent is not entitled to prevail because he is precluded for some other reason.'" (citation omitted)). This is precisely what CSX seeks to do in this case. Under its preclusion defense, even if Pitts's allegations are true, CSX is still not liable because 49 C.F.R. § 213.103 precludes the claim.

## Satisfying the Burden of Proof

The question still remains as to the nature of that burden, and whether CSX satisfied it at trial.[10] We have already concluded as a matter of law that 49 C.F.R. § 213.103 substantially subsumes any FELA claim based on ballast performing a track-support function. CSX's burden, therefore, is to show that Pitts's FELA claim falls into that category of ballast. CSX argues that it has met that burden and is entitled to judgment in its favor because "the evidence clearly established[ ] that the ballast on which [Pitts] worked provides track support." As examination of the testimony will show, CSX was not successful in this regard.

Pitts testified that as a fireman, hostler, and brakeman, he would walk two to three miles a day. As an engineer, he testified that he would walk between half-a-mile to a mile-and-a-half a day. To illustrate the surfaces on which he walked, Pitts identified numerous pictures of large ballast in CSX's Baltimore yards and testified that those pictures reflected the conditions in which he was required to work. Pitts testified that he would most often encounter large ballast while he was working in the yards, and that the type of ballast on which he walked did not vary much between yards because they all contained "[p]retty much all road ballast."

Pitts then called Raymond Duffany as an expert in the area of railroad engineering and safety. Duffany testified that "the large ballast isn't really safe to walk on." He testified that in

---

10. Federal preclusion is often viewed as a question of law, calling for an appellate review of the legal question. *See Nickels v. Grand Trunk W. R.R., Inc.,* 560 F.3d 426, 429 (6th Cir.2009) ("Whether a federal law preempts a state law or precludes another federal law is a question of law which we review de novo."); *Davis,* 598 F.Supp.2d at 956 ("The basic facts in this case are undisputed, and the outstanding issue is purely a legal question of whether plaintiff's FELA claim is precluded by the Federal Railroad Administration's (FRA) regulation regarding ballast."); *cf. Melton v. BNSF Ry.,* 322 S.W.3d 174, 190 (Tenn.Ct.App. 2010) (stating that "preemption is a question of law"); *Kohn v. Burlington N. & Santa Fe R.R.,* 77 P.3d 809, 811 (Colo.Ct.App.2003) ("Federal preemption is a question of law subject to de novo review by this court.").

his experience, "after several years of putting the large ballast down in the yards, the number of injuries related to walking on ballast, such as slips, trips and falls, started to increase." But after "a directive to start putting small ballast down in the yards," those injuries went down. He then testified that, according to industry standards, "[t]he one and a half inch ballast is too large for use in yard tracks. Three quarter inch [walking] ballast is to be used." He also testified that CSX and the American Association for Railway Engineers adopted similar requirements.

Yet, said Duffany, CSX was not in compliance with these standards.[11] Duffany identified numerous pictures he had taken of large ballast in CSX's Baltimore yards. Some of those pictures even showed "very large pieces of rock that doesn't [sic] fit into any ballast classification in the walkway area. . . . The size is so large that it would not fit into any of the acceptable sizes for main track or yard ballast." Duffany testified that most of the pictures contained "an uneven walkway surface and it's all large main line ballast." He also concluded that "with the exception of a very few yards [CSX] consistently violated their own standards for walkways."

On cross-examination of Duffany, CSX sought to prove that the large ballast on which Pitts walked was necessary to support the track structure:

Q: Mr. Duffany, you've defined a walkway in a rail yard as essentially anywhere within that rail yard that an employee might walk?

A: That makes sense, yes.

Q: And areas where an employee might walk within a rail yard, would necessarily include areas alongside the track or perhaps even within what's known as the gauge of the track, would it not?

A: That's correct.

---

11. Duffany provided his opinion based on reasonable engineering certainty.

Q: When we talk about the gauge of the track, that's the area between the two train tracks where the train usually is?

A: That's correct.

\* \* \*

Q: This gentlemen [sic] who is coupling the air hose actually has one foot within the gauge of the track or between the two tracks and one foot just outside the track?

A: It appears that he does, yes.

\* \* \*

Q: Ballast is directly underneath the track or within the gauge of the track. Does that help support the track structure?

A: Yes, it does.

Q: Does that help drain the track structure?

A: Yes.

Q: Ballast that's immediately adjacent to the track, is that also helping support and drain the track structure?

A: Yes, it is.

Q: Necessarily, the areas where Mr. Pitts would walk during the course of his career as a railroad engineer, would include areas that were immediately alongside the track and, in fact, occasionally within the gauge of the track because of the fact that he works on locomotives, would they not?

A: I believe so, yes.

CSX also got Duffany to concede that CSX would be in compliance with its own standards and industry standards for areas where CSX had small ballast in its yards.

During the defense's case, CSX called a witness to rebut Pitts's claim that it used large ballast in the areas where Pitts worked. As its corporate representative, CSX called Matt Gross, who serves as the Road Foreman of Engines and supervises the locomotive engineers in his territory. Gross testified that he took about 3,000 steps in the typical work

shift. When asked on what surfaces those steps were taken, the following exchange took place:

A: Well, they were in the office. They were on paved driveway, walking up towards, you know, 22 Track at Locust Point. They were inspecting a locomotive. Walking around a locomotive.

They were walking in different places also on the locomotive itself and on the walkways of a locomotive.

Q: We have heard a lot of discussion in this case of what has been generically called big ballast. . . .

\* \* \*

Q: What kind of ballast did you use on the main line tracks?

A: Well, main track ballast.

Q: What kind of ballast did you use on the yard tracks?

A: Yard ballast.

Contradicting Duffany's testimony, Gross testified that all of CSX's Baltimore yards contain small ballast. Yet, after Gross reviewed during cross-examination the photographs of large ballast taken by Duffany, he acknowledged there was large ballast in the yards, asserting that those are places where engineers never walk. To support his testimony, Gross identified numerous photographs taken by CSX showing small ballast in areas of CSX's Baltimore yards where engineers would regularly walk.

The defense then rested without eliciting any other form of testimony or evidence regarding whether the claims made by Pitts regarded ballast that performed a track-support function or not. At that point, CSX moved for judgment, arguing that Pitts's claim was precluded as a matter of law because *parts* of it were based on ballast that performed a track-support function:

[Defense Counsel]:Your Honor, with regard to those areas—the areas that not are simply and strictly walkways, but that are in fact, parts of the track and parts of the track

structure and these are areas that clearly Mr. Pitts is claiming—

\* \* \*

[Defense Counsel]: With regard to that task, for instance, where a foot is clearly inside the rail and the Plaintiff, when doing the task, would have to be actually within the track structure....

\* \* \*

[Defense Counsel]: Your Honor, just for the record, under 49 CFR 213 the ballast that's within the track structure where Mr. Pitts was performing inspections, was changing air hoses is, in fact, part of the track structure and not part of the rail yard.

Hearing the argument, the trial court was obviously concerned that there was insufficient evidence to prove the preclusion defense as a matter of law:

The Court: **Well, I only know of one that's been referred to and identified by anyone.**

[Defense Counsel]: I would suggest that it's not just the areas stepped while performing air hoses, but also the locomotive inspection, which is an area that Mr. Duffany—

The Court: Well, I don't know that....

\* \* \*

[Defense Counsel]:—testified that those are areas adjacent to the tracks and supportive of the track structure.

The Court: **Well, those are two separate things, an area adjacent to requires definition. The question becomes as to what it is by definition for exclusion.**

[Defense Counsel]: And my suggestion, Your Honor, would be that the areas within the gauge of the track and the areas immediately adjacent to the track where Mr. Pitts was performing those items, are areas that are preempted or precluded—(Emphasis added.)

While pondering the motion, the trial court asked defense counsel for the specific evidence showing that Pitts walked on ballast that performed a track-support function:

The Court: **Do I have—**

\* \* \*

The Court:—**any evidence of that other than the one picture in question?**

[Defense Counsel]: You have the evidence from Plaintiff's liability expert, who on cross conceded that those are areas where Mr. Pitts worked and that were supportive of the track structure under 219 CFR.

The Court: No. He did say that there was an area that supported a track structure and the Court would agree with you, if you're referring to ballast that is in support of the track structure. . . .

[Defense Counsel]: Because those tasks were done on ballast that is covered—and it's completely covered and therefore preempted under the Federal Track Safety Standards, there are portions of Plaintiff's claim that cannot be distinguished from the remaining ballast.

The Court: **If you, in fact, were able to isolate it I will respond, but if you're going to sing to the wind you're wasting my time.** (Emphasis added.)

Concluding its preclusion argument, CSX asserted:

[Defense Counsel]: Just to finish the argument the suggestion would be the doctors wouldn't be able to distinguish the tasks that were done on that type of ballast from walking between the trains and the yard office or any other areas. Therefore, they can't distinguish injury—(Emphasis added).

These passages from the trial demonstrate that the only instance in which CSX attempted to adduce evidence to meet its burden of showing that Pitts only or primarily walked on support ballast was during the cross-examination of Pitts's expert Duffany. CSX cites testimony where Duffany acknowledged that ballast "directly underneath the track or within the

gauge of the track" and ballast "immediately adjacent to the track" are used to support the track structure. CSX argues that Pitts worked in this area, pointing to Pitts's testimony that his "duties were of the sort that required him to be either within the gauge of the track or immediately adjacent to the track." It is this testimony, in addition to one picture in which a person coupling an air hose is shown with one leg inside the track rails, on which CSX bases its entire preclusion defense.

Fatal to CSX's defense is that it never proved what area of ballast actually provides the track support. It is likely that Pitts walked on some track-support ballast. But to warrant the grant of its motion for judgment on preclusion grounds, CSX was required to show what area of ballast was used for track support, so that the trial court could determine whether that area substantially covered the places where Pitts walked on ballast.

CSX claims that the track-support structure included the ballast located "immediately adjacent to the track." [12] But, this general phrase is not self-defining, and CSX never defined the area it considered to be "immediately adjacent to the track." [13] This is important, because without such a definition it is impossible to tell where the track-support structure is located. Under the phrase "immediately adjacent to," the track-support structure could extend beyond the rails by two inches or six feet or more. [14] Clearly there must be some

---

12. CSX also claims that the track-support structure is comprised of ballast that is "directly underneath the track or within the gauge of the track." In this regard, CSX did define the gauge of the track as "the area between the two train tracks where the train usually is."

13. In its brief, CSX argues that the concept of "walkways" along the track "rest[s] on a false dichotomy." Without any citation to the record or support from evidence adduced at trial, CSX asserts: "The fact that a particular area might serve as a 'walkway' for employees does not mean that it is distinct from the track-support structure." Without evidence proved at trial, this claim does not suffice to meet CSX's burden.

14. As the trial court correctly noted, "an area adjacent to requires definition. The question becomes as to what it is by definition for exclusion."

outer limit to the track-support structure. But, CSX's failure to delineate its size and shape, as well as to establish how often Pitts walked on this track-support structure,[15] made it impossible for the trial court to rule, as a matter of law, that CSX met its burden of proving preclusion. Instead, CSX now relies on evidence showing, at most, that at some point during some portion of his job, Pitts walked on ballast that was part of the track-support structure.

Evidence that Pitts walked on track-support ballast could have contributed to a preclusion defense—if CSX had (1) proven where the track-support ballast was located, and (2) then asked for jury resolution of the question of whether walking on track-support ballast substantially caused his injury.[16] Yet CSX did neither of these things, perhaps for strategic reasons. Without such evidence and a factual resolution of this issue, CSX cannot prevail, on appeal, in its claim that 49 C.F.R. § 213.103 "substantially subsumes" Pitts's FELA claim.

### Jury Instructions

Alternatively, CSX seeks a new trial based on two allegedly erroneous jury instructions:[17] the first, informing

---

15. CSX appears to have been aware of the value of such evidence, as it had hired its own expert in railroad engineering and safety. Attached to CSX's Motion for Partial Summary Judgment on Plaintiff's Claim of Improper Ballast was the affidavit of CSX's expert engineer Roy Dean. In the affidavit, Dean stated that "the ballast complained of by Plaintiff was either under, alongside, or adjacent to the track (rails and ties) and/or switches, and constituted structural support and/or adequate drainage for the track, within purview of and in compliance with 49 C.F.R. § 213.103." Dean also stated "that the ballast in the photographs [taken by Duffany] serves the function of structural support of the track and/or adequate drainage, and therefore falls within the purview of 49 C.F.R. § 213.103." Dean was listed as a potential expert witness in CSX's pre-trial statement but was never called at trial.

16. As to the second item, we have reviewed the record and find no indication that CSX asked that the jury be given a special verdict sheet allowing these factual questions to be resolved.

17. We note that CSX casts this argument—that the two jury instructions were erroneous—in the framework of the Court of Special Appeals

the jury about the history and purpose behind the enactment of FELA; and the second, telling the jury that violation of a statute is evidence of negligence. We review a trial judge's decision whether to give a jury instruction under the abuse of discretion standard. *Conyers v. State,* 354 Md. 132, 177, 729 A.2d 910, 934 (1999). Moreover, we will overturn a jury verdict and grant a new trial based on such an error only if it rises to the level of prejudicial error.

In determining whether there was error, "[i]t is well settled that when [an] objection is raised to a court's instruction, attention should not be focused on a particular portion lifted out of context, but rather its adequacy is determined by viewing it as a whole." *Collins v. State,* 318 Md. 269, 283, 568 A.2d 1, 8 (1990) (citation and quotation marks omitted). Error will be found if the given instruction is not supported by evidence in the case. *Rustin v. Smith,* 104 Md.App. 676, 680, 657 A.2d 412, 414 (1995).

The proven error must then be prejudicial, not harmless. In *Barksdale v. Wilkowsky,* we discussed the distinction between a prejudicial and harmless error at length. 419 Md. 649, 20 A.3d 765 (2011). We stated that for an error to be prejudicial, "the complainant must show that prejudice [is] 'likely' or 'substantial.'" *Id.* at 662, 20 A.3d at 773 (citation omitted). In other words, the "complainant who has proved error must show more than that prejudice [is] *possible;* she must show instead that it was probable." *Id.*

### Statutory Purpose of FELA

First, CSX objects to the following portion of the trial judge's instruction to the jury regarding FELA's history and purpose:

using an improper "employee-friendly" standard of review. CSX claims that the Court of Special Appeals affirmed the use of the two instructions under the "mistaken assumption that it was obliged to bend over backward to uphold Plaintiff's judgment," and that had the "correct" standard of review been employed, the instructions would have been found to be erroneous. We do not address the issue of the "employee friendly" standard of review, however, because even applying the standard of review which CSX asks for, CSX still loses.

For your understanding, . . . the Federal Employers Liability Act was, in fact, enacted back in 1908. . . . The reason . . . is not as much of a debate in this case, but it was in recognition of the dangers involved in railroad work and to alleviate the harsh results imposed by the results thereof.

Relying on the Fourth Circuit case *Stillman v. Norfolk & Western Railway Co.*, CSX argues that informing a jury about the underlying purpose of enacting a statute is contrary to the law, and thus error. In that case, a railroad employee argued that the trial court had committed error "in refusing to permit his counsel to present an argument to the jury concerning Congress's intent in enacting the FELA." *Stillman*, 811 F.2d 834, 838 (4th Cir.1987). In rejecting the claim of error, the Fourth Circuit stated: "So long as the jury was properly instructed on the applicable law, we can see no reason why it would be either necessary or appropriate for the jury to hear an argument about Congress's intent in enacting the law." *Id.* CSX seeks to capitalize on this language to support its stated proposition that "informing the jury about Congress's reason for enacting FELA is improper."

Pitts counters that "this Court and the Court of Special Appeals have held that informing jurors of a statute's purpose is not error." For support, Pitts cites *Dillon v. State*, 277 Md. 571, 357 A.2d 360 (1976), *abrogated in part by Stevenson v. State*, 289 Md. 167, 423 A.2d 558 (1980), *as stated in Unger v. State*, 427 Md. 383, 413, 48 A.3d 242, 260 (2012). In *Dillon*, while instructing the jury in a criminal case, involving charges of robbery and handgun offenses, the trial judge read from the "Declaration of Policy" for the handgun legislation. *Id.* at 573–74, 357 A.2d at 363. The Declaration discussed an "alarming increase" in violent crimes involving handguns, a "substantial increase" in people killed due to handguns, the ineffectiveness of previous laws, and the necessity of the current law "to preserve the peace and tranquility of the State." *Id.* In finding no error, this Court stated that, "the recitation of the 'Declaration of Policy' did no more than relate the purposes behind the enactment of the statute upon which [the counts] were based, the preamble was accurately stated,

and was an aid and means of enlightenment to the deliberations of the jury as judges of the law." *Id.* at 585, 357 A.2d at 369 (citations omitted).

In deciding whether the statutory purpose instruction was proper, we observe that neither party's support is overly persuasive. *Stillman* did not involve a jury instruction. Rather, it involved an attorney who wanted to argue the purpose of FELA to the jury, not a judge instructing the jury on the applicable law. *See* 811 F.2d at 838. And, in *Dillon*, the instruction was found not to be erroneous "in view of the provisions in Article XV, Section 5 of the Maryland Constitution, providing that '[i]n the trial of all criminal cases, the Jury shall be the Judges of Law, as well as of fact,'" and therefore, "any instructions on the law ... are purely advisory and the jury must be so informed." 277 Md. at 580, 357 A.2d at 366 (alterations in original) (citations omitted). But this proposition of law does not apply to civil cases and is no longer the law in criminal cases.

We return, therefore, to our well-established rule that the appropriateness of an instruction must be determined in its full context. Because we believe that CSX's limited quotation of the instruction fails to do this, we sketch out a more complete context below. The trial court instructed the jury as follows:

> From the outset of this case, the Court has attempted to make sure that you knew that this is case is somewhat special or different, ... and I again remind you of that.
>
> \* \* \*
>
> So, therefore we impress upon you to make sure that you understand you must pay close attention that this is a particularly different case....
>
> You may have understood or thought you knew of what it is that Workers [sic] Compensation case. This is not a Workers [sic] Compensation case. It is not, in a normal sense, a normal tort by common law.... Congress has instituted certain laws that apply in certain areas specifically designed to certain industries.

For instance, ... there are special laws that apply in the railroad industry, which is this case obviously.

\* \* \*

You're further instructed that the Federal Employers Liability Act or FELA provides a cause of action to the railroad employee engaged in this [interstate] commerce for personal injury caused in whole or in part by the negligence by any of it's [sic] carriers, employees or agents again, or by defects due to the carriers negligence.

**For your understanding, ... the Federal Employers Liability Act was, in fact, enacted back in 1908, while we were all young....**

**The reason ... is not as much of a debate in this case, but it was in recognition of the dangers involved in railroad work and to alleviate the harsh results imposed by the results thereof.**

The Federal Employers Liability Act impose [sic] on the Defendant railroad a duty to it's [sic] employee and to all of it's [sic] employees including Plaintiff to exercise reasonable care to provide the employee with a reasonably safe place in which to work, reasonably safe conditions to work and reasonably safe tools and equipment.

The employer owes a duty to provide a reasonably safe place to work as you have been instructed and the employer is liable if it's [sic] negligence played any part no matter how slight in bringing about Plaintiff's injuries. (Emphasis added).

When read in its complete context, it becomes clear that the purpose for giving the instruction was to impress upon the jury the relative uniqueness of a FELA action in state court. FELA is neither a common law negligence case nor a Workers' Compensation claim—it is a "hybrid," unlike anything the typical juror would have previously encountered. *See Miller*, 159 Md.App. at 129–31, 858 A.2d at 1028–30. To aid the jury in understanding that a suit under FELA is unique, the Circuit Court sought to explain the statute's history and purpose. In this context, it was not error to give the com-

plained of instruction. *See Martin v. Burlington N., Inc.*, 47 Or.App. 381, 614 P.2d 1203, 1205 (1980) (no error in instructing the jury on the basic purpose of Congress in enacting FELA); *see also Carey v. New Yorker of Worcester, Inc.*, 355 Mass. 450, 245 N.E.2d 420, 423 (1969) (no error in instructing the jury as to the purpose of a statute).

### *Violation of Statute as Evidence of Negligence*

Second, CSX objects to the following portion of the trial judge's instruction to the jury stating that violation of a statute was evidence of negligence:

> the violations of the statute which [are] caus[ally] related to the injury in question may be considered by you as evidence of negligence. If you find from the evidence that there was a violation of the statute which is caus[ally] related, you may consider such violation as evidence of negligence.

Both parties agree that the giving of this instruction was error, because there was no evidence of a statutory violation. The parties disagree whether such error rose to the level of prejudice.

To show prejudice, CSX argues: "Plaintiff's expert opined at length that, by using large ballast in its rail yard, CSX[ ] had violated ballast standards promulgated by industry organizations." CSX then argues, that "if the jury credited the expert's testimony, it could well have believed that it was entitled to 'consider such violation as evidence of negligence,' an erroneous conclusion that effectively relieved Plaintiff of his burden to prove that CSX[ ] was negligent."

Pitts responds that "[t]here is no reason to think that the jury incorrectly based its finding of liability on a misconception that CSX violated a statute." In Pitts's view, "CSX's own argument actually demonstrates how harmless the instruction was" because permitting the jurors to consider violation of industry standards as evidence of negligence cannot be prejudicial "when the violation of industry standards is, in fact, solid evidence of negligence."

 We agree with the parties that the instruction was error because there was no evidence that a statute was violated. Yet, there was other evidence of negligence that was more than adequate. Duffany, Pitts's expert in railroad engineering and safety, testified that the vast majority of CSX's rail yards violated industry standards, national standards, and CSX's own standards. Maryland law has long recognized that industry standards can be admissible to show the applicable standard of care, and violations of the standard of care are certainly appropriate for the jury to consider when determining the issue of negligence. *See C & M Builders, LLC v. Strub,* 420 Md. 268, 282, 22 A.3d 867, 875 (2011) ("[I]ndustry standards ... may be admissible as evidence of applicable standards of care."); *Jacques v. First Nat'l Bank,* 307 Md. 527, 544, 515 A.2d 756, 764 (1986) ("As in any other negligence case, an industry standard, if it exists, may be proven as evidence of the applicable standard of care.").

Moreover, Pitts did not mention any violation of statute in his closing argument to the jury. On balance, we assess it unlikely that the jury was misled by the instruction or that they were distracted by it so as to "speculate about inapplicable legal principles." *Barksdale,* 419 Md. at 669, 20 A.3d at 777 ("An erroneous instruction may be prejudicial if it is misleading or distracting for the jury, and permits the jury members to speculate about inapplicable legal principles."). We decline to grant CSX a new trial.

### Cross–Examination Using Statistical Data

Finally, CSX asks for a new trial on the issue of damages based on the trial court's refusal to allow CSX to cross-examine Pitts's expert economist with statistical data regarding the expected worklife of railroad employees. At trial, Pitts called an economics expert, Dr. Bruce Hamilton to testify regarding Pitts's future economic wage loss. Dr. Hamilton's calculations were based on Pitts's assertion that, if he had not been injured, he would have continued to work until he turned 68. CSX attempted to cross-examine Dr. Hamilton as to the American Association of Railroad's ("AAR") worklife

expectancy tables for railroad employees, hoping to show that average age of retirement for railroad employees is 60. The trial court limited, but did not ban altogether, cross-examination by CSX regarding railroad industry statistics regarding the age of retirement.

The Circuit Court made its ruling based on an interpretation of the collateral source rule, which bars introduction of evidence pertaining to the compensation the plaintiff "has received from sources unrelated to the tortfeasor," permitting recovery of "full amount of his or her provable damages." *Haischer v. CSX Trans., Inc.*, 381 Md. 119, 132, 848 A.2d 620, 627 (2004) (citation omitted). To decide whether the trial court was overly restrictive, we examine the expert's cross-examination at trial.

### *Dr. Hamilton's Testimony*

Below are the relevant passages of CSX's attempted cross-examination of Dr. Hamilton, the objections, and colloquy with the court:

Q. It is true isn't it, Dr. Hamilton, that the appropriate methodology for a forensic economist is to, in fact, use data to the extent it's pertinent and available in making your calculation?

A. It's always appropriate to use data—the best data available, when it's pertinent and available, yes.

\* \* \*

Q. You do know that the American Association of Railroads publishes a work life expectancy table for employees, don't you?

A. Yes.

[Plaintiff's Counsel]: Objection, Your Honor.

The Court: Approach.

At the bench, counsel then had the following exchange regarding whether the AAR worklife expectancy tables were an appropriate subject for cross-examination:

[Plaintiff's Counsel]: **Your Honor, this is getting exactly into what** *Tiller* **says not to get into.**

\* \* \*

[Defense Counsel]: It's really not.

The Court: **I am concerned that you are getting close to it so help me out.** I am.

[Defense Counsel]: I'm really not. He just sat and told us that if data is available that he uses data. There is data available for the railroad employees that establishes work life expectancy.

\* \* \*

The Court: ... **Specifically I am concerned that we're getting into an area that clearly** *Bickerstaff* **is saying don't go to.**

Now, now that I've said that, be cautious that you've gone too far, in my mind. **You can touch** but you have to move on. (Emphasis added.)

After being instructed that he could "touch" upon the statistics, defense counsel continued to advance his argument that the statistics focused exclusively on worklife and had nothing to do with retirement benefits:

[Defense Counsel]: I don't [want] to incur your wrath, but are you telling me that I can't ask him about the AAR work life tables?

The Court: **You can touch,** but you're going to have to move on because what I'm saying is—the last statement was is that based on what we do know is that it's an inappropriate—

[Defense Counsel]: **These tables don't have anything to do with retirement benefits. This is straight work life stuff.**

The Court: No. That isn't what I'm doing because it is the same, in my humble opinion, it is the same. Are you aware that railroad employees generally don't retire until age such an [sic] such or do retire at age such and such.

Using the table to substitute for our question as to the assumption that he should be retiring at age 60, when he's now saying he has an intention to—you can argue but even though that he says that he's going to retire at 67, that is unlikely based on information received from him that he would work that long.

\* \* \*

[Defense Counsel]: **No, the case talks about retirement benefits.**

\* \* \*

[Defense Counsel]: **I'm talking about work life.**

The Court: No, listen to me [defense counsel], because you're finer than I am on this subject. I know you are. The issue is the same as the argument over the age of 60.

What you want to argue, in a circular fashion, is that the evidence is likely that he will retire younger based on something else.

\* \* \*

[Defense Counsel]: The evidence is geared toward the fact that they have asked the jury to assume a fact that he is going to work until age 67. I should be allowed to offer alternative facts to demonstrate that there is statistical analysis—(Emphasis added.)

The trial judge then clarified that, based on his reading of the Court of Special Appeals precedent, he would only allow defense counsel to "touch" upon the subject:

The Court: If I were sitting in your chair, I would try to make that argument. **The wisdom of Judge [Moylan] in both of his opinions connecting that which is in** *Miller* **to** *Tiller* **and that which was—**

\* \* \*

The Court: **As to Judge Woodward's writing in** *Bickerstaff.* **It is that—I can't let you do that,** under FELA's interpretation, which liberally applies to the employee. I have to say that. I did allow you to **touch** and move on. If

you insist, I have to make a different ruling. (Emphasis added.)

With permission to "touch" upon the worklife tables, defense counsel continued his cross-examination of Dr. Hamilton:

Q. Dr. Hamilton, have you ever seen a statistical analysis of work life expectancy for railroad employees?

A. Yes.

\* \* \*

Q. **And Dr. Hamilton, what does that statistical analysis tell us as the likely retirement age for Mr. Pitts?**

[Plaintiff's Counsel]: Objection.

The Court: Sustained. You can sit.

\* \* \*

Q. If we use a different retirement age, would that change your calculations?

A. Yes.

Q. Let me ask you—you said you relied upon information from Counsel; right?

A. Correct.

\* \* \*

Q. ... What age were you told by the lawyer, at least in that paragraph to rely on?

A. Age 60.

Q. **And we're relying upon age 60, as is indicated in that letter, be consistent with any statistical analysis of which you're aware?**

[Plaintiff's Counsel]: Objection.

The Court: Approach. (Emphasis added.)

When counsel again approached the bench, the Circuit Court decided to allow the question and answer:

[Plaintiff's Counsel]: Same objection, Your Honor. He's getting—he's trying to get to the same place through a different path.

\* \* \*

[Defense Counsel]: It's in his letter.

The Court: At the moment the answer is—**I will change to overrule and allow that question and answer, which is yes.** The problem is going to be what you do as the follow-up.

\* \* \*

The Court: You assume there won't be much of a follow-up to that. (Emphasis added.)

Returning to open court, the trial judge began by informing the jury of his decision to allow the answer to the previous question:

The Court: **The Court is reversing and allowing the answer to the last question, which is yes** . . . . (Emphasis added.)

Defense counsel then pursued cross-examination, but encountered another objection:

Q. **Are you aware of any information that's been indicated that the 60 age indicated in the letter would be a more appropriate age to use in your calculation?**

[Plaintiff's Counsel]: Objection

The Court: Sustain[ed.] (Emphasis added).

Counsel for the defense chose not to re-phrase his question, but then moved on to a different area of questioning, returning to the topic of Pitts's retirement age only at the end of his cross-examination: "If you assume that he would have retired at age 60, what would his economic loss be?" Dr. Hamilton's answer was "Zero."

### *Retirement Benefits vs. Statistics as Implicating Collateral Source Rule*

Reviewing the trial transcript, it is clear that the trial court allowed some reference to the AAR worklife expectancy tables, but limited cross-examination of Pitts's expert regarding those tables. The trial court based its decision to allow limited cross-examination of Pitts's expert witness on two Court of Special Appeals' cases, which examined the collateral

source rule: *Norfolk S. Ry. Corp. v. Tiller,* 179 Md.App. 318, 944 A.2d 1272 (2008) and *Bickerstaff,* 187 Md.App. 187, 978 A.2d 760, and Pitts relies on them here. We will consider these cases, as well as our decision in *Haischer v. CSX Transportation,* 381 Md. 119, 848 A.2d 620.

We begin with *Haischer,* the earliest of the three cases. In *Haischer,* CSX sought to introduce evidence that the employee was receiving disability benefits [18] (1) to establish that the employee was a malingerer and (2) to refute his claim of "financial hardship." 381 Md. at 129, 848 A.2d at 625–26. The employee argued, however, that evidence of disability benefits was inadmissible under the collateral source rule. *Id.* at 128, 848 A.2d at 625. In resolving the dispute between the parties, this Court relied on the Supreme Court's case of *Eichel v. New York Central Railroad Co.,* 375 U.S. 253, 84 S.Ct. 316, 11 L.Ed.2d 307 (1963), which established the "basic law regarding the admissibility," in a FELA case, of evidence that the plaintiff was receiving disability benefits. 381 Md. 119 at 132, 848 A.2d at 627. We pointed out that the Supreme Court in *Eichel* "did not view the admissibility of this kind of evidence as discretionary on the part of the trial court, . . . but ruled as a matter of substantive law that the danger of misuse outweighed any probative value of the evidence, at least as to malingering." *Id.* at 133, 848 A.2d at 628. We viewed this evidentiary ruling as entirely consistent with prior decisions of this Court, and therefore, held "as a matter of State law . . . that evidence of a plaintiff's receipt of [disability] benefits is ordinarily inadmissible to show possible malingering on the part of the plaintiff." *Id.* at 134, 848 A.2d at 629.

In *Tiller,* the Court of Special Appeals addressed the admissibility of retirement benefits as evidence of when an employee could have been expected to retire if he had not been injured. 179 Md.App. at 321, 944 A.2d at 1274. The intermediate appellate court analyzed both *Eichel* and *Haischer* and held

---

**18.** Although the employee was receiving payments from the Railroad Retirement Fund, those were disability benefits. *Haischer v. CSX Trans., Inc.,* 381 Md. 119, 128, 848 A.2d 620, 625 (2004).

that the collateral rule barred evidence of eligibility for retirement benefits. 179 Md.App. at 331–40, 944 A.2d at 1281–86. The court reasoned that "evidence of future retirement or pension benefits is not admissible" in those circumstances because "[t]he probative value is too attenuated to offset the potential misuse that the jury could make of the evidence." *Id.*

Relying on *Tiller*, Pitts opposes a new trial on the grounds that whether to refuse to allow CSX to use "AAR statistics" was within the trial court's discretion. Under this discretion, Pitts argues, the trial court properly "concluded that allowing additional cross-examination on the retirement statistics would be akin to . . . evidence that railroad employees are eligible to retire and receive retirement benefits at age 60."

But neither *Haischer* nor *Tiller* dealt with the issue presented in this case, *i.e.* worklife expectancy statistics that *do not* disclose receipt or eligibility for any benefits to the jury. Here, CSX sought to question Dr. Hamilton about statistics published by the AAR presumably in order to rebut Pitts's testimony that he intended to work until age 68. Unlike this case, in *Haischer*, we were faced with the admissibility of *disability benefits* proffered by the railroad "to show possible malingering on the part of the plaintiff." 381 Md. at 134, 848 A.2d at 629. The holding of the Court of Special Appeals in *Tiller* went no further than this. Relying on *Haischer*, *Tiller* held that the collateral source rule precluded evidence of *future retirement benefits* paid by the Railroad Retirement Board to prove when an employee *would have retired.* Again, *Tiller* did not exclude statistics bearing on the statistical-based worklife expectancy of a railroad employee.[19]

---

**19.** To be sure, there is broad language in *Tiller*, saying that "[e]vidence bearing on the expected work-life of the employee is not a cognizable exception to the collateral source rule." 179 Md.App. at 340, 944 A.2d at 1286. Yet, that is dictum, as the case involved direct evidence of retirement benefits. It is not at all clear that the Court of Special Appeals intended to rule out all statistics, a result not called for by the Supreme Court in *Eichel* or the Court of Appeals in *Haischer*.

Indeed, one year later, the Court of Special Appeals rejected such a broad interpretation of *Tiller* in *Bickerstaff*, a case with an almost identical factual scenario as we have before us now. Like here, in *Bickerstaff*, CSX attempted to cross-examine the same expert, Dr. Hamilton, with the same AAR worklife tables, but the employees argued the tables should be excluded based on *Tiller*. *See* 187 Md.App. at 240–44, 978 A.2d at 792–93. The intermediate appellate court said, however, that the employees' reliance on *Tiller* was misplaced because *Tiller* dealt with "one's eligibility to receive retirement benefits at age 60," but *Bickerstaff* did not. *Bickerstaff*, 187 Md.App. at 244, 978 A.2d at 792. Rather, the question in *Bickerstaff* was based on "statistical information that 'the overwhelming majority of people that retire in the railroad industry were, in fact 60 years old.'" *Id.*, 978 A.2d at 792–93. Thus, the Court of Special Appeals distinguished *Tiller* and recognized that a question about the age at which someone is likely to retire differs from a question about the eligibility to receive benefits upon retirement.[20]

We agree with that distinction, and hold that, although retirement eligibility information in a FELA case is barred by the collateral source rule, statistics about average retirement age for railroad workers is not. These statistics differ from the evidence of disability benefits banned in *Haischer* and retirement benefits held inadmissible in *Tiller*.

Furthermore, statistics discussing an individual's projected date of retirement, or worklife expectancy, have been widely held to be relevant when future wage loss is at issue. *See*

---

**20.** The *Bickerstaff* court went on, however, to affirm the trial court's exclusion of the retirement age statistics on other grounds. The court held that because "statistical information that 'the overwhelming majority of people that retire in the railroad industry were, in fact, 60 years old'" did not "relate to appellees individually, the determination as to the relevance of Dr. Hamilton's answer fell within the trial judge's discretion." *CSX Transp., Inc. v. Bickerstaff*, 187 Md.App. 187, 244, 978 A.2d 760, 792–93 (2009). The court found the trial court did not abuse its discretion. *Id.*, 978 A.2d at 793. As we discuss below, we disagree with the contention that statistical information about average retirement age is irrelevant when future wage loss is at issue.

*Boucher v. U.S. Suzuki Motor Corp.,* 73 F.3d 18, 23 (2d Cir.1996) ("It was not an abuse of discretion for the district court to admit Dr. Reagles' testimony regarding Boucher's pre and post-injury work-life expectancy ... based on widely accepted work-life tables published by the Department of Labor...."); *Weil v. Seltzer,* 873 F.2d 1453, 1465 (D.C.Cir. 1989) (defendant may "offer the Department of Labor statistics into evidence and request the expert to base his opinion on the work-life expectancy contained in the Department of Labor's table"); *Madore v. Ingram Tank Ships, Inc.,* 732 F.2d 475, 478 (5th Cir.1984) (absent evidence that a person "is likely to live *and* work a longer, or shorter, period than the average[, worklife] computations should be based on the statistical average"); *see also Tempel v. Murphy,* 202 Md.App. 1, 19–20, 30 A.3d 992, 1003 (2011) (plaintiff was not required to prove a specific retirement age because the "jury could consider the totality of the evidence, including Mr. Murphy's age, health, employment, financial situation, and general population statistics, *i.e.,* life expectancy and worklife expectancy, to determine the amount of lost support"); *Great Coastal Express, Inc. v. Schruefer,* 34 Md.App. 706, 729, 369 A.2d 118, 131 (1977) ("The court did not abuse its discretion in hearing the expert," whose testimony considered "such factors as the work life expectancy of the decedent and reduction of future earnings to present worth.").[21]

Use of industry statistics about average retirement age in this context is not evidence of other compensation the plaintiff would receive for the same damage, but rather, evidence that

---

**21.** *But see Marcel v. Placid Oil Co.,* 11 F.3d 563, 567–68 (5th Cir.1994) (trial court did not abuse its discretion in excluding study of worklife expectancy of oilfield workers, where there was no "indication of how the oilfield worklife differs from that of other occupations" so as to "show that [the employee] would likely have a shorter worklife and thus should not receive damages based on an average worklife"); *Herold v. Hajoca Corp.,* 864 F.2d 317, 322 (4th Cir.1988) (trial judge did not abuse discretion in concluding that "region-wide statistics would be of limited probative value in determining whether discrimination took place in one particular branch," and finding "that the confusion the statistics might cause for the jury would outweigh their probative value").

shows that the full amount of lost wages claimed by the plaintiff may not exist. In other words, the tables may cast doubt on a plaintiff's statement that he would work until a certain age, and thus suggest to the fact-finder that the lost wage claim was exaggerated. This differs from *Haischer*, in which the Court, when excluding evidence of disability benefits, reasoned that there were "alternative ways of showing malingering that do not carry" the danger that evidence of retirement benefits would carry. Such justification does not apply when what the defense wants to rebut is the worker's stated intent to work until age 68. Malingering can be proven by the classic defense video showing the plaintiff doing some activity at odds with her claimed disability. It would be much more difficult to rebut a person's stated intent about his plans to retire.

Although the collateral source rule bars evidence of disability and retirement benefits, a defendant railroad should not be defenseless against the plaintiff's "1–2 combo"—self-serving testimony about his retirement plans and expert projections about damages based on that testimony. Moreover, it would be unfair to allow the plaintiff to clothe his own prediction about his retirement date with the protective folds of the economist's projections about damages, while denying the defendant the right to use cross-examination to cast legitimate doubt on the assumption made by that economist that the claimant would retire at age 68.

### *The Trial Court Walked A Careful Line*

Applying the conclusions from the precedents discussed above, we analyze the interplay of the cross-examination. The colloquy between the trial court and counsel reveals that the trial court, although initially refusing CSX the opportunity to examine Pitts's expert regarding worklife expectancy tables, on reflection, was willing to allow CSX to "touch" upon the subject. The trial court walked a careful line. On the one hand, the trial court allowed CSX to ask, "And we're [sic] relying upon age 60, as is indicated in that letter, be consistent with any statistical analysis of which you're aware?" The

answer was "yes." On the other hand, the trial court sustained objections, without more discussion, to two of defense counsel's questions: "And Dr. Hamilton, what does that statistical analysis tell us as the likely retirement age for Mr. Pitts?" and "Are you aware of any information that's been indicated that the 60 age indicated in the letter would be a more appropriate age to use in your calculation?"

Following the court's ruling on the last objection, defense counsel moved the focus of his cross-examination away from the AAR worklife tables and onto other assumptions underlying Dr. Hamilton's calculations. Moving the inquiry away from the AAR statistics was either strategic or based on counsel's assumption that the trial court would not allow any more questions about the statistics pertaining to retirement. Yet, a close examination of the colloquy reveals that the latter assumption would not have been justified.

Having told defense counsel that the court would allow the defense to "touch on" the statistics, the trial court left the door open for counsel to ask the witness about what those statistics said regarding most people retiring. But instead, defense counsel asked the witness to opine as to the "likely retirement age for Mr. Pitts" and then asked for "any information" that an age of 60 was "a more appropriate age" to determine when Pitts would have retired. These two specific questions fell within the discretionary orbit of the trial judge because both questions were objectionable.

The first question—"And Dr. Hamilton, what does that statistical analysis tell us as the likely retirement age for Mr. Pitts?"—was objectionable because it assumes facts not in evidence. As Judge Joseph Murphy, writing for this Court, has explained: such a "question was objectionable [because] it assumed a fact not in evidence. An argumentative question is one which incorporates by assumption a fact otherwise not in evidence." *Johnson v. State*, 408 Md. 204, 224, 969 A.2d 262, 273 (2009) (citation and quotation marks omitted); *see also Holy Trinity Russian Indep. Orthodox Church v. State Roads Comm'n*, 249 Md. 406, 414, 240 A.2d 255, 259 (1968) (not error

for trial judge to exclude cross-examination question to expert without proper foundation or proffer); *Commonwealth Bank of Balt. v. Goodman*, 128 Md. 452, 464, 97 A. 1005, 1010 (1916) ("Questions asked an expert on cross-examination ought to be based upon facts proved and ought not to assume facts of which there is no evidence."); *Simpson v. State*, 121 Md.App. 263, 288, 708 A.2d 1126, 1138 (1998) ("Furthermore, questions that assume facts not in evidence are objectionable.") (citation omitted); 6 Lynn McLain, *Maryland Practice: Maryland Evidence State & Federal* § 611:5 (2d ed.2001) (explaining that questions on cross-examination which assume facts not in evidence are objectionable).

In this case, the question posed by defense counsel clearly assumes that the statistical analysis is in evidence, which it was not. Without laying a proper foundation, the defense counsel sought to have Dr. Hamilton discuss the substance of some statistical analysis with which the jury was not familiar. The only foundation laid by CSX was that at some point in time, Dr. Hamilton had "seen a statistical analysis of worklife expectancy for railroad employees." The jury knew nothing else about the statistical analysis to which Dr. Hamilton was referring. It is not even clear that Dr. Hamilton and defense counsel were referring to the same statistical analysis. Indeed, right before this question, the defense counsel had shown Dr. Hamilton a statistical study of worklife expectancy for railroad employees, marked as Defendant's Exhibit 33, and Dr. Hamilton denied ever seeing this particular study. Under such circumstances, this question had the potential to mislead the jury and was objectionable for assuming facts not in evidence.

■ The second question—"Are you aware of any information that's been indicated that the 60 age indicated in the letter would be a more appropriate age to use in your calculation?"—was objectionable because it was likely to elicit an answer implicating the collateral source rule. Given the expansive nature of this question—asking Dr. Hamilton for "any information"—it was possible that Dr. Hamilton would have

included Pitts's eligibility for retirement benefits in his answer. Such evidence, however, is inadmissible as violating the collateral source rule, and therefore, sustaining the objection was proper. *See Haischer,* 381 Md. at 134, 848 A.2d at 629; *Tiller,* 179 Md.App. at 340, 944 A.2d at 1286.

In sum, although the Circuit Court did not have the discretion to ban cross-examination using the AAR worklife expectancy tables under the collateral source rule, the record shows that the court was not so restrictive. The trial court, although reluctantly, did leave room for CSX to ask about the statistics. CSX, however, asked objectionable questions and apparently elected to abandon this line of cross-examination. On this record, we are not persuaded that we should grant CSX a new trial on the issue of damages.

### CONCLUSION

We hold that Pitts's FELA claim, alleging negligent use of ballast, was not precluded by FRSA because CSX failed to prove that the ballast complained of performed a track-support function. Additionally, the trial court did not commit prejudicial error by instructing the jury about the purpose behind FELA's enactment and explaining that violation of a statute was evidence of negligence. And finally, the trial court did not err in its rulings regarding the use of the AAR worklife expectancy tables on cross-examination.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS TO BE PAID BY PETITIONER.**